WO                          IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

KAREN COSGROVE, a single person,          )
                                          )
                              Plaintiff,  )
                                          )
          vs.                             )
                                          )
NATIONAL FIRE & MARINE INSURANCE          )
COMPANY, a foreign insurer,               )
                                          )          No. 2:14-cv-2229-HRH
                              Defendant.  )
_____)

O R D E R

Motion to Compel

Plaintiff moves to establish waiver of the attorney-client privilege as to communica-

tions between defendant and its coverage counsel regarding settlement of the underlying

case and to compel production of all documents containing such communications.[1]  This

motion is opposed.[2]  Oral argument was requested[3] but is not deemed necessary.

Background

Plaintiff is Karen Cosgrove.  Defendant is National Fire & Marine Insurance

Company.

---

[1]Docket No. 121.

[2]Docket No. 125.

[3]Docket No. 127.

Plaintiff hired WTM Construction to remodel her home.  Plaintiff alleges that "there were various defects in, and damage arising out of, the remodeling work."[4]  Plaintiff filed suit in state court against WTM and William and Lana Mitzel, the owners of WTM, seeking damages arising out of the remodel work (the underlying case).[5]  WTM was insured by defendant and defendant defended WTM under a reservation of rights.[6]  The firm of Righi Hernandez (Righi) was retained by defendant to represent WTM.[7]

In October 2010, Righi advised defendant that "[w]e believe the settlement value of [the underlying] case is in the range of $85,000 to $110,000, inclusive of attorney's fees and cost[s]."[8]  On December 28, 2010, Righi "request[ed] ... authority to provide Plaintiff with an Offer of Judgment for $110,000."[9]  In March 2011, Righi "recommend[ed] authority up to $105,000 to submit an Offer of Judgment to Plaintiff...."[10]

---

[4]Complaint at 2, ¶ 8, Exhibit A, Notice of Removal, Docket No. 1.

[5]Id. at ¶ 9.

[6]Id. at ¶ 10.

[7]Letter from National Fire to WTM Construction, Inc. at 1, Exhibit D, Motion to Compel [etc.], Docket No. 121.

[8]Letter from Righi Hernandez to Anne Rohling at 11, Exhibit E at 12, Motion to Compel [etc.], Docket No. 121 (emphasis omitted).

[9]Letter from Righi Hernandez to Anne Rohling at 8, Exhibit F, Motion to Compel [etc.], Docket No. 121.

[10]Letter from Righi Hernandez to Anne Rohling at 9, Exhibit E at 23, Motion to Compel [etc.], Docket No. 121.

In February 2011, plaintiff made a $109,000 Offer of Judgment and Righi requested "authority of up to $109,000 with which to negotiate a settlement."[11] Defendant rejected this offer.  Plaintiff contends that there is no documentation in the claims file as to why the offer was rejected.

In late 2011 or early 2012, defendant retained the firm of Graif Barrett & Matura to provide advice about coverage under the WTM policy.

In January 2012, the parties mediated the underlying case.  Plaintiff contends that the Graif firm was involved in the mediation.  Anne Rohling, defendant's adjuster who was handling the case, requested $23,000 in settlement authority.[12]  Rohling had also done a case analysis pursuant to which she estimated the value of the underlying case at  $74,000.[13]  Rohling testified that she could only speculate that the difference between the $23,000 amount and $74,000 amount was based on a discussion with Rick Ratz, her supervisor.[14]

Defendant ultimately offered $30,000 to settle the case during the mediation, "$8,000 of which was National Fire money, and 22,000 was in conjunction with moneys that had

---

[11]Letter from Richard L. Righi & Gregory E. Williams to Anne Rohling at 2, Exhibit H at 3, Motion to Compel [etc.], Docket No. 121.

[12]Videotaped Deposition of Anne Rohling at 163:5-8, Exhibit I, Motion to Compel [etc.], Docket No. 121.

[13]Id. at 175:17-19.

[14]Id. at 176:5-6.

been collected from subcontractors."[15]  In August 2012, defendant made an offer of judgment in the underlying case of $22,500.[16]

Rohling testified that defendant's settlement decisions were based on a determination that there was a 80 percent chance that defendant would be able to defeat coverage based on exclusions in WTM's policy.[17]  Rohling testified that in coming up with that number (the 80% chance of success), she considered "[h]ow we consistently handle[d] the issue in the past, and – in general, how we consistently handle[d] an issue in the past from court to court, state to state, and in general, what – what advice the coverage counsel has contributed."[18] Rohling testified that she did not "recall if I came up with that number based on something we normally do or if I talked to coverage counsel about it."[19]  She also testified that "[g]enerally, that would be something I would discuss with coverage counsel.  Specifically [as to the underlying case], I do not know."[20]

_____

[15]Deposition of Rick Ratz at 31:19-32:3, Exhibit J, Motion to Compel [etc.], Docket No. 121.

[16]Letter from Richard L. Righi to Anne Rohling (dated Jan. 22, 2013) at 2, Exhibit L, Motion to Compel [etc.], Docket No. 121.

[17]Rohling Deposition at 179:19-180:3, Exhibit I, Motion to Compel [etc.], Docket No. 121.

[18]Id. at 188:10-15.

[19]Id. at 180:14-17.

[20]Id. at 180:22-24.

Rohling testified that it would be consistent with defendant's practice for the analysis of how she determined that defendant had an 80 percent chance of success to be documented in the claim file.[21]  Rohling testified that it is possible that the redacted portion of her case summary[22] might provide some indication as to how the 80 percent number was reached.[23]  At her deposition, Rohling agreed that "as part of the duty of good faith, an insurer must document its investigation and its evaluation in such a way that the timing and adequacy of what it did can be independently reviewed[.]"[24]

In January 2013, with trial in the underlying case just three months away, Mr. Righi requested $120,000 in settlement authority because he could not "guarantee that I will be able to pull a rabbit out of my hat on this one."[25]

In April 2013, plaintiff, WTM, and the Mitzels settled the underlying case and in September 17, 2013, "they executed a <u>Morris</u> agreement...."[26]  "Under the <u>Morris</u> Agreement, WTM assigned to Cosgrove all of its rights, title, interests, proceeds, causes of action, and

---

[21]<u>Id.</u> at 183:22-184:6.

[22]Exhibit A at NFM-Cosgrove 03350, Motion to Compel [etc.], Docket No. 121.

[23]Rohling Deposition at 177:3-5, 184:17-186:24, Exhibit I, Motion to Compel [etc.], Docket No. 121.

[24]<u>Id.</u> at 62:1-8.

[25]Letter from Richard Righi to Anne Rohling at 2, Exhibit L, Motion to Compel [etc.], Docket No. 121.

[26]Complaint at 2, ¶ 12, Exhibit A, Notice of Removal, Docket No. 1.

claims of any kind whatsoever related to the project that WTM may have had against its insurers, including [defendant]."[27]

Plaintiff alleges that pursuant to the <u>Morris</u> Agreement, the state court "entered a stipulated judgment ... in favor of Cosgrove ... in the amount of $443,690."[28] "Under the <u>Morris</u> Agreement, the parties agreed that if Cosgrove recovered an amount less than $443,690 from National Fire, WTM would be required to make payment to Cosgrove in the amount of up to $25,000 for damages sustained by Cosgrove relative to the remodeling work."[29]

Plaintiff alleges that defendant then intervened in the underlying case and after a reasonableness hearing, the state court "determined that the net reasonable settlement amount ... to which [defendant] may be bound was $254,373, thus ensuring that Cosgrove would collect less than the $443,690 agreed upon amount and that WTM would be required to pay $25,000 to Cosgrove."[30] Plaintiff alleges that she has demanded payment of $254,373 from defendant but that defendant has refused to make any payment.[31]

---

[27]<u>Id.</u> at 3, ¶ 13.

[28]<u>Id.</u> at ¶ 14.

[29]<u>Id.</u> at ¶ 15.

[30]<u>Id.</u> at ¶ 19.

[31]<u>Id.</u> at 3-4, ¶ 20.

Based on these allegations, plaintiff has asserted a breach of contract and a bad faith claim against defendant.  Plaintiff alleges that defendant has breached the WTM insurance policy "by failing [to] meet its indemnity obligations under the insurance policy and by failing to make payment for the $254,373 judgment."[32]  Plaintiff also alleges defendant has breached the WTM insurance policy

> by waiting an unreasonable amount of time to make a determi-
> nation as to indemnification and/or giving untimely notice to
> WTM that it would not indemnify it for any damages awarded
> Cosgrove or judgment entered against WTM, thereby prejudic-
> ing and damaging WTM by precluding it from (a) settling the
> matter for a lesser amount, (b) avoiding a larger judgment, and
> (c) avoiding the $25,000 payment to Cosgrove.[33]

Plaintiff's bad faith claim is also based on the allegation that defendant waited "an unreasonable amount of time to make a determination as to indemnification and/or by untimely giving notice to WTM that it would not indemnify it for any damages awarded to Cosgrove or for judgment entered against WTM[.]"[34]  Plaintiff also alleges that it was a breach of the duty of good faith for defendant to seek "to reduce the amount of judgment from $443,690 to $254,373, thereby ensuring that WTM would be liable to Cosgrove for the

---

[32]Id. at 4, ¶ 26.

[33]Id. at ¶ 27.

[34]Id. at 4-5, ¶ 29.

$25,000 payment."[35]  Plaintiff further alleges that defendant breached its duty of good faith when it rejected her $109,000 settlement offer, which was less than the policy limits.[36] Plaintiff alleges that defendant "gave more consideration to its interests than WTM's and thereby placed its interests before WTM's when it rejected the offer – an offer that was predicated on WTM's and National Fire's own assessment of the damages Cosgrove had incurred as a result of WTM's conduct on the project."[37]

Plaintiff has requested that defendant produce its communications with the Graif firm to the extent that the communications 1) occurred during the underlying case and 2) addressed the coverage issues on which defendant based its decision not to settle the underlying case.  Defendant has asserted attorney-client privilege as to its communications with the Graif firm.[38]  Plaintiff now moves to compel production of these communications.

### Discussion

Plaintiff contends that the Graif communications are relevant to her bad faith claim. "An insurer acts in bad faith when it unreasonably investigates, evaluates, or processes a claim (an 'objective' test), and either knows it is acting unreasonably or acts with such reckless disregard that such knowledge may be imputed to it (a 'subjective' test)."  <u>Nardelli</u>

---

[35]<u>Id.</u> at 5, ¶ 30.

[36]<u>Id.</u> at 5-6, ¶¶ 34-40.

[37]<u>Id.</u> at 6, ¶ 38.

[38]<u>See</u> Privilege Log, Exhibit B, Motion to Compel [etc.], Docket No. 121.

v. Metropolitan Group Property and Cas. Ins. Co., 277 P.3d 789, 794–95, (Ariz. Ct. App. 2012).   Defendant contends that its conduct was objectively reasonable and that its settlement decisions were subjectively reasonable.

Defendant does not necessarily dispute that the Graif communications may be relevant to its claim that its settlement decisions were subjectively reasonable.   Rather, defendant contends that it should not be compelled to produce these communications because they are subject to the attorney-client privilege.

"In diversity actions, questions of privilege are controlled by state law."   In re California Public Utilities Com'n, 892 F.2d 778, 781 (9th Cir. 1989).   "The attorney-client privilege is absolute.   It is not qualified like the deliberative process privilege or the work product doctrine.   Thus, if a communication is privileged, it normally cannot be obtained in discovery no matter how relevant it might be to the claims or defenses at issue in the action." Arizona Dream Act Coalition v. Brewer, No. CV–12–02546–PHX-DGC, 2014 WL 171923, at *4 (D. Ariz. Jan. 15, 2014).

Plaintiff argues that defendant has impliedly waived its privilege as to the communications in question.  In Arizona, courts consider three factors to determine whether there has been an implied waiver of privilege:

> "(1) [whether the] assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) [whether] through this affirmative act, the asserting party put the protected information at issue by making it relevant to the

case; and (3) [whether] application of the privilege would have
denied the opposing party access to information vital to his
[case.]"

Burch & Cracchiolo, P.A. v. Myers, 351 P.3d 376, 382 (Ariz. Ct. App. 2015) (quoting State

Farm Mut. Auto. Ins. Co. v. Lee, 13 P.3d 1169, 1174 (Ariz. 2000)).

"[T]here is no question that express reliance on an advice-of-counsel defense would

constitute an implied waiver...." Lee, 13 P.3d at 1175. "The question here is whether and

when an assertion short of an express advice-of-counsel defense waives the privilege." Id.

In Lee, the court found that when an insurer defends a bad faith claim exclusively on

the basis that its actions were objectively reasonable and "merely ask[s] its expert witness[es]

to evaluate the reasonableness of its conduct under the statutes, the case law, and the policy

language," the insurer has not impliedly waived the attorney-client privilege because it has

not put any advice it received from counsel at issue. Id. at 1177. But, the court found that

an insurer impliedly waives the privilege when it

has asserted some claim or defense, such as the reasonableness
of its evaluation of the law, which necessarily includes the
information received from counsel. In that situation, the party
claiming the privilege has interjected the issue of advice of
counsel into the litigation to the extent that recognition of the
privilege would deny the opposing party access to proof
without which it would be impossible for the factfinder to fairly
determine the very issue raised by that party. We believe such
a point is reached when, as in the present case, the party
asserting the privilege claims its conduct was proper and
permitted by law and based in whole or in part on its evaluation
of the state of the law. In that situation, the party's knowledge

about the law is vital, and the advice of counsel is highly
relevant to the legal significance of the client's conduct.

Id. at 1179.  As the court explained,

> We assume client and counsel will confer in every case, trading
> information for advice.  This does not waive the privilege.  We
> assume most if not all actions taken will be based on counsel's
> advice.  This does not waive the privilege. Based on counsel's
> advice, the client will always have subjective evaluations of its
> claims and defenses.  This does not waive the privilege.  All of
> this occurred in the present case, and none of it, separately or
> together, created an implied waiver.  But the present case has
> one more factor—State Farm claims its actions were the result of
> its reasonable and good-faith belief that its conduct was permit-
> ted by law and its subjective belief based on its claims agents'
> investigation into and evaluation of the law.  It turns out that the
> investigation and evaluation included information and advice
> received from a number of lawyers.  It is the last element,
> combined with the others, that impliedly waives the privilege.
> State Farm claims that its actions were prompted by what its
> employees knew and believed, not by what its lawyers told
> them.  But a litigant cannot with one hand wield the
> sword—asserting as a defense that, as the law requires, it made
> a reasonable investigation into the state of the law and in good
> faith drew conclusions from that investigation—and with the
> other hand raise the shield—using the privilege to keep the jury
> from finding out what its employees actually did, learned in,
> and gained from that investigation.

Id. at 1183.

Here, defendant's subjective reasonableness claim is based on a determination that

there was an 80 percent chance of defeating the insured's claims based on policy exclusions

in the WTM policy.  Rohling testified that she could not specifically recall if she relied on

coverage counsel's advice to make this determination, but that she would generally have discussed such a matter with coverage counsel.  Given that the 80% chance of success determination involves an evaluation of the law, it is highly likely that Rohling's determination was informed by counsel's advice.  In making her determination, which involved a legal evaluation, it is more probable than not that Rohling not only consulted the Graif firm, but necessarily relied on the information and advice she received.

"Under Lee, to waive the attorney-client privilege, a party must make an affirmative claim that its conduct was based on its understanding of the advice of counsel—it is not sufficient that the party consult with counsel and receive advice."  Everest Indemnity Insurance Co. v. Rea, 342 P.3d 417, 419 (Ariz. Ct. App. 2015).  By arguing that its settlement decisions were subjectively reasonable based on its adjustor's evaluation of the law, defendant has made an affirmative claim that is almost assuredly based on Rohling's understanding of the advice she received from coverage counsel.  "[W]hen an insurer raises a defense based on factual assertions that, either explicitly or implicitly, incorporates the advice or judgment of its counsel, it cannot deny an opposing party the opportunity to discover the foundation for those assertions in order to contest them."  Mendoza v. McDonald's Corp., 213 P.3d 288, 302 (Ariz. Ct. App. 2009).  Because defendant has raised a defense that is highly likely to have incorporated the advice or judgment of its coverage counsel, defendant cannot shield its communications with the Graif firm.  It would be unfair

to not give plaintiff an opportunity to discover what advice Rohling might have received from coverage counsel.

In sum, the court finds that defendant's affirmative act of claiming that its conduct was subjectively reasonable has put its communications with the Graif firm at issue and that this information may be vital to plaintiff's case. Thus, defendant has impliedly waived the attorney-client privilege as to its communications with the Graif firm to the extent those communications addressed the coverage issues in the underlying case on which defendant based its settlement decisions. But plaintiff is only entitled to those communications that pre-date the Morris Agreement. Any communications that occurred after the Morris Agreement was executed are unlikely to be relevant to plaintiff's bad faith claim.

## Conclusion

Plaintiff's motion for a hearing[39] is denied. Plaintiff's motion to compel[40] is granted. Defendant shall produce its communications with the Graif firm to the extent those communications occurred prior to September 17, 2013 and addressed the coverage issues in the underlying case on which defendant based its settlement decisions.

DATED at Anchorage, Alaska, this 2nd day of September, 2016.

/s/ H. Russel Holland
United States District Judge

---

[39]Docket No. 127.

[40]Docket No. 121.