**Lewis Roca Rothgerber Christie LLP**
201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

**Steven J. Hulsman** (State Bar No. 010929)
Direct Dial: 602.262.5313
Direct Fax: 602.734.3769
Email:  shulsman@lrrlaw.com

**The Butler Law Firm**
3800 North Central Avenue, Suite 810
Phoenix, Arizona 85012-3338

**Everett S. Butler** (SBN 018262)
**Matthew D. Williams** (SBN 026404)
Telephone: (602) 288-0588
Facsimile: (602) 288-0587
ebutler@butlerlawaz.com
mwilliams@butlerlawaz.com

*Attorneys for Plaintiff/Counterdefendant Karen Cosgrove*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| KAREN COSGROVE, a single person, | No.  2:14-cv-02229-PHX-HRH |
| Plaintiff/Counterdefendant, | **PLAINTIFF'S REVISED PARTIAL SUMMARY JUDGMENT MOTION RE ESTOPPED COVERAGE DEFENSES** |
| vs. | |
| NATIONAL FIRE & MARINE INSURANCE COMPANY, a foreign insurer, | **(Oral Argument Requested)** |
| Defendant/Counterplaintiff. | |

Plaintiff Karen Cosgrove moves for partial summary judgment.  Fed. R. Civ. P. 56(a).  This motion seeks an order that Defendant National Fire is estopped from asserting its coverage defenses under *Parsons v. Continental Nat'l Am. Group*, 550 P.2d 94 (Ariz. 1976).  National Fire hired an attorney to represent its insured under a reservation of rights.  That attorney obtained information from the insured pursuant to the attorney-client relationship, then shared it with National Fire.  National Fire used the information to invoke an exclusion under the policy and deny reasonable settlement offers that would have protected its insured.  Under these circumstances, *Parsons* prohibits National Fire from maintaining its wrongfully procured coverage position.

2011380128_1

## I. INTRODUCTION

This is a lawsuit for breach of contract and bad faith, brought by Cosgrove as the assignee of WTM Construction's and William Mitzel's (collectively "Mitzel") rights and claims against National Fire under an insurance policy issued by National Fire to Mitzel. Cosgrove hired Mitzel to perform contracting services as part of a home remodel. Those services were poorly done, leading to significant property damage at the Cosgrove residence. Cosgrove sued Mitzel, who tendered his defense to National Fire.

National Fire defended the lawsuit under a reservation of rights. National Fire reserved the right to pay nothing on a judgment against Mitzel and also to recoup from Mitzel all attorneys' fees and costs incurred in defending the Cosgrove lawsuit.

National Fire believed it could defeat coverage to Mitzel under a policy provision entitled "M5095, Independent Contractors and Sub-contractors Coverage Requirement Exclusion" (the "Subcontractor Exclusion"). Based on that analysis, National Fire denied reasonable settlement offers by Cosgrove and made only *de minimis* settlement offers itself. National Fire thus failed to protect Mitzel from personal exposure to a judgment against him. Those denials, coupled with the reservation of rights and the risk it created for Mitzel, caused Cosgrove and Mitzel to enter into a *Morris* agreement, in which Mitzel assigned his rights against National Fire to Cosgrove. This suit followed, in which National Fire continues to contend the Subcontractor Exclusion defeats coverage.

National Fire received the information for its coverage position from the attorney it hired to represent Mitzel. The information counsel provided was obtained from the attorney-client relationship. Under *Parsons*, National Fire was prohibited from relying on that information and has therefore waived its coverage defense.

///
///
///

## II. UNDISPUTED FACTS

### A. Cosgrove sued Mitzel and National Fire defended under a reservation of rights.

On April 10, 2009, Plaintiff Karen Cosgrove sued Mitzel for extensive damage caused by faulty construction in remodeling her house, as well as related misconduct. (Ex. 1.)

Mitzel was insured by a commercial general liability policy (the "Policy") issued by National Fire that, absent an applicable exclusion, covered Cosgrove's claim. (Ex. 24, Depo. of A. Rohling, at 222-23.) The Policy required National Fire to defend Mitzel, and pursuant to that duty, National Fire hired Mr. Righi ("Defense Counsel") to represent Mitzel. (*Id.* at 70.)

National Fire regularly employed Defense Counsel to defend its insureds in construction defect cases and paid Defense Counsel between $100,000 and $400,000 annually for its services. (*Id.* at 95; Ex. 25, Depo. of R. Righi, at 11-12, 17, 26-27.) National Fire was one of Defense Counsel's top five clients. (Ex. 25, at 9-10.)

### B. Mitzel's policy included a Subcontractor Exclusion on which National Fire's reservation of rights relied.

National Fire, via Defense Counsel, defended Mitzel pursuant to a reservation of rights, set forth in three letters. (Exs. 4, 5, 20.) The Subcontractor Exclusion was one of the many potential coverage defenses listed in the reservation of rights. (Exs. 4, 5, 20, 28.) That exclusion denied coverage for damage arising out of operations performed by subcontractors unless four conditions were met. (Exs. 4, 5, 20, 28.) One of those conditions required written indemnity agreements between the insured and subcontractor with some very specific provisions requiring, among other things, the subcontractors to have liability insurance and to list National Fire as an additional insured under that policy. (Ex. 28.)

///

///

### C. Defense Counsel obtained information about the Subcontractor Exclusion in the course of representing Mitzel.

In Defense Counsel's June 2, 2009 acknowledgement letter to National Fire, he promised to "initiate attempts to gather as much information as possible regarding . . . the extent to which WTM Construction [*i.e.*, Mitzel] actually performed work at the Cosgrove residence." (Ex. 2.) Defense Counsel followed through with that promise and met with Mitzel in early June 2009. (Ex. 3.) During that meeting, Defense Counsel learned two facts that would prove critical to the Subcontractor Exclusion: (1) most of the construction work was done by subcontractors, and (2) subcontractor agreements could not be located. (*Id.*)

After subsequent investigation, Defense Counsel concluded these two facts were not entirely accurate. The subcontractor agreements still could not be located, but Defense Counsel concluded that **all** of the work (not most of it) had been done by subcontractors.[1] (Exs. 9- 11, 13- 15, 17, 21.) Defense Counsel specifically recalled being given this additional information directly by Mitzel. (Ex. 25, at 83-84, 86.)

Although he was hired to defend Mitzel against Cosgrove's claims, Defense Counsel did his own coverage analysis in April 2010. (Ex. 8.) Consistent with his conclusions about the subcontractors and the lack of subcontracting agreements, Defense Counsel identified the Subcontractor Exclusion as "creat[ing] the most significant risk" for Mitzel obtaining coverage. (*Id.* at 2-3.) Defense Counsel concluded that without subcontractor agreements, Mitzel could not satisfy the requirement in the Subcontractor Exclusion that National Fire be named as an additional insured in the subcontractors' liability policies, and if subcontractors did all the work, Mitzel would not be entitled to coverage. (*Id.*)

///

///

---

[1] Cosgrove disputes that subcontractors did all of the work, but whether subcontractors in fact completed all of the work is immaterial to this motion.

### D. Defense Counsel shared with National Fire the subcontractor information he obtained in the course of representing Mitzel.

Despite identifying the Subcontractor Exclusion as a vital coverage issue for Mitzel, Defense Counsel provided information about Mitzel's subcontracting to National Fire – information he obtained in the course of representing Mitzel. (Ex. 24, at 18-19, 91, 96-97, 100-02, 106-08, 113, 123, 132-33, 286-87; Ex. 25, at 12-13, 18, 27-32, 49, 61-65, 82-84, 86, 99-100, 114-15, 123, 136; Exs. 2-3, 6, 9-11, 13-15, 17, 21, 28, 31.) Defense Counsel specifically told National Fire that "[a]ll construction work was completed by subcontractors," and he was "unable to locate written contracts" between Mitzel and the subcontractors. (Ex. 9.) Both were conclusions that Defense Counsel drew from speaking with Mitzel and otherwise investigating the claim on Mitzel's behalf. (Ex. 25, at 83-84, 86, 99-100, 115, 126; Ex. 31.)

In the end, Defense Counsel reported to National Fire everything he thought could come out in a disclosure statement or deposition, and everything he believed National Fire would find if it did its own investigation – regardless of whether that information might be detrimental to Mitzel's interest. (Ex. 25, at 64-65, 123.) He never limited his firm's reporting to National Fire in any fashion in any of his cases where there was a Reservation of Rights.[2] (*Id.* at 27.)

### E. National Fire relied exclusively on information obtained from Defense Counsel for its coverage analysis.

National Fire admits that as soon as it issued its first reservation of rights letter, it had an independent obligation to do its own coverage investigation. (Ex. 24, at 48; Ex. 25, at 32.) National Fire's claims person, Rohling, acknowledged that an insurance

---

[2] This is symptomatic of a larger overall problem at National Fire. Rohling testified that National Fire did not split Mitzel's claim file between coverage and liability to avoid a conflict of interest their own expert says is "inherent" in a reservation of rights defense. (Ex. 7; Ex. 26, at 28; Ex. 27, Depo. of S. Plitt, at 39-40; *see also* Ex. 24, at 72-75, 119-21.) National Fire's expert admits that splitting the claim file when there is a reservation of rights is "industry custom," but he claims – without authority – that custom does not apply to construction defect litigation. (Ex. 26, at 28; *see also* Ex. 7.)

company may not refuse to settle a claim without conducting a reasonable investigation. (Ex. 24, at 49.)

Notwithstanding this obligation, National Fire's standard practice was to do **no independent coverage investigation of its own**; it always had Defense Counsel do that work **and** defend the insured. (*Id.* at 119-20, 123.) Rohling did not typically have any conversation with the insured and did not typically do Examinations Under Oath (commonly called an "EUO"). (*Id.* at 91.) Instead, she routinely relied on Defense Counsel to not only defend the insured, but provide her with the information she needed to decide whether there was coverage under the insured's policy. (*Id.* at 96-97, 123, 132-33.)

With respect to this particular claim, she testified that she made her coverage decisions based on information provided exclusively by Defense Counsel. (*Id.* at 12-31, 75, 79, 85, 92, 96-97, 123, 119-20, 123, 131-33, 179-80, 230, 272-74; Ex. 19.) And she acknowledged that this information likely came directly from Mitzel, saying she could not explain where Defense Counsel could have obtained the information other than from his client. (Ex. 24, at 85.)

### F. Based on the information provided by Defense Counsel, National Fire determined there was an 80% chance it could defeat coverage.

In analyzing coverage – in particular, the effect of the Subcontractor Exclusion – Rohling relied on two different facts: (1) there were no subcontractor agreements, and (2) the subcontractors did all the work, including the framing. (*Id.* at 272-74.) These are the same two facts that were included in Defense Counsel's multiple status letters to National Fire. (Exs. 9-11, 13-15, 17, 21.) They are also the same two facts that led Defense Counsel to conclude that the Subcontractor Exclusion posed the greatest risk to Mitzel. (Ex. 8, at 2-3.) Rohling does not recall any other facts she believed were relevant to the exclusion analysis. (Ex. 24, at 274.)

Based on these facts, and her reading of the Subcontractor Exclusion, Rohling assessed an 80% chance of defeating coverage. (*Id.* at 179-80, 230.) Documents

recently produced pursuant to the Court's order compelling production of privileged communications, leave no doubt that National Fire relied exclusively on information from defense counsel to make this coverage assessment:

> M5095 Independent Contractors and Sub-Contractors Coverage Requirement Exclusion. Coverage Counsel advises that under Arizona law, M5095 may exclude coverage on this claim. **Per defense Counsel**, WTM did no[t] produce contracts with subcontractors. Therefore, I estimated that the court would allow the exclusion and decide that there is no coverage under the policy 80% of the time. This reduction is reflected in the expected values spreadsheet.

(Ex. 30.)

### G. Based on its 80% assessment, National Fire rejected reasonable settlement offers, and made negligible offers in return.

Rohling's 80% risk assessment had a tangible impact on the settlement negotiations between Mitzel and Cosgrove. She admitted that the difference between her recommended settlement authority (around $25,000) and Defense Counsel's repeated requests for settlement authority (around $110,000), was based on "the analysis on the coverage," and National Fire's "belief of the 80 percent chance of success on the subcontractor exclusion." (Ex. 24, at 230.) This reliance on the 80% assessment made its mark on the negotiation process, from beginning to end.

From early on, Defense Counsel recognized that Cosgrove had a meritorious case and was likely to obtain a jury verdict against Mitzel for a significant amount of money, plus attorneys' fees. Repeatedly during the case, Defense Counsel recommended to National Fire that it try to settle the case for something between $85,000 and $120,000. (*E.g.*, Exs. 10, 14.)

In December 2010, Defense Counsel requested settlement authority of $110,000. (Ex. 11, at 8.) National Fire rejected that advice, and offered nothing.

In February 2011, Cosgrove offered to settle all claims against all defendants for $109,000, if National Fire would pay that judgment amount. (Ex. 12.) Defense Counsel passed that recommendation to National Fire, recommending authority of $109,000 to settle all claims. (Ex. 13.) This offer was actually less than the settlement

authority previously requested by Defense Counsel.  (Exs. 11-12.)  National Fire knew this was an opportunity to settle all claims against Mitzel, with no financial exposure to him, (Ex. 24, at 278), and Rohling agrees that absent the coverage issue, the offer was reasonable, (*id.* at 222-23).

Yet, National Fire did not take Defense Counsel's recommendations and did not settle the case.  (*Id.* at 281.)  National Fire chose to reject the offer, and give Defense Counsel no authority to settle.  (Ex. 16, at NFM-Cosgrove 01807.)  By rejecting the $109,000, National Fire left Mitzel exposed to an uncovered (and substantial) judgment, but still paid attorneys' fees to Defense Counsel of $171,632 – **in 2011 alone**.  (Ex. 29.)

In January 2012, Cosgrove, Mitzel, and National Fire participated in mediation.[3]  (Ex. 24, at 143, 153-54; Ex. 18, at 2.)  Despite Defense Counsel's recommendation for settlement authority of $110,000, Rohling requested authority of only $23,000.  (Ex. 24, at 163-64; Ex. 18, at 6.)  The case did not settle for that small amount.  National Fire offered only $30,000, of which only $8,000 was its money; the remainder was recovered from subcontractors.  (Ex. 23, Depo. of R. Ratz, at 31-32.)

In August 2012, National Fire authorized an Offer of Judgment to Plaintiff for $22,500.  (Ex. 21, at 2.)  As of January 2012, National Fire had spent $300,000 defending the case.  (Ex. 29.)  Not surprisingly, Rohling could not explain the business justification for spending $300,000 to defend a case that could have been settled for $109,000.  (Ex. 24, at 239.)

In January 2013, Defense Counsel again recommended authority of as close to $120,000 as possible.  (Ex. 21, at 2.)  He noted he did not believe he would "be able to pull a rabbit out of a hat on this one," and obtain a favorable result for his clients and

---

[3] This mediation is what finally spurred National Counsel to hire Coverage Counsel. (Ex. 20; Ex. 24, at 125-27, 133, 153-64.)  The day before the mediation, Coverage Counsel agreed with National Fire that it should deny coverage under the Subcontractor exclusion, saying "all work was performed by subcontractors" and there were "[n]o written contracts."  (Ex. 32.)  These, of course, are the same facts Defense Counsel obtained from representing Mitzel and communicated to National Fire.

National Fire. (*Id.*) National Fire again rejected that advice and refused to protect Mitzel. (*Id.*)

### H. As a result of National Fire's coverage position, Mitzel was forced to execute a Morris Agreement with Cosgrove.

On the eve of trial, with National Fire entrenched in its reservation of rights, believing coverage could be defeated with the Subcontractor's Exclusion, and having declined to make any meaningful settlement efforts, Cosgrove and Mitzel entered into a *Morris* Agreement, whereby the parties stipulated to a judgment for $443,690. (Ex. 22, at 3.) After a one-day reasonableness hearing, the judgment amount was finalized at $254,373, plus $50,000 Mitzel had already agreed, or would ultimately need, to pay. (*Id.* at 6.) When National Fire refused to pay this judgment, Cosgrove filed suit in state court, which National Fire removed to this Court. (Doc. 1 & 1-2.) National Fire continues to defend against coverage based on the Subcontractor Exclusion. (Doc. 5 (Answer & Declaratory Claim); Ex. 26, at 15-16, 19, 26.)

## III. ARGUMENT

### A. The *Parsons* Doctrine prohibits insurers from denying coverage based on information obtained in violation of the attorney-client relationship.

This motion is controlled by the Arizona Supreme Court's decision in *Parsons v. Continental Nat'l Am. Group*, 550 P.2d 94 (Ariz. 1976). Under *Parsons*, when an insurer-hired attorney "uses the confidential relationship . . . to gather information so as to deny the insured coverage," the insurer waives "any policy defense," and "is estopped as a matter of law from disclaiming liability under an exclusionary clause in the policy." 550 P.2d at 99; *see also Lake Havasu Cmty. Hosp., Inc. v. Ariz. Title Ins. & Trust Co.*, 687 P.2d 371, 384 (Ariz. App. 1984), *disapproved on other grounds*, *Barmat v. John & Jane Doe Partners A-D*, 747 P.2d 1218 (Ariz. 1987) (similar).

The attorney in *Parsons* was hired by an insurer to defend an insured in a personal injury lawsuit. *Parsons*, 550 P.2d at 96. "[D]uring the discovery process and, more importantly, from the attorney-client relationship," the attorney obtained

information that suggested the insured's actions were intentional, rather than negligent. *Id.* at 97. The attorney shared this information with the insurer, which then issued a letter to the insured saying it would investigate the incident and continue providing a defense, but reserved its right to invoke the policy exclusion for intentional acts. *Id.* at 96. After judgment was entered against the insured, the insurer defeated a garnishment action by using the information provided by the attorney to prove the intentional acts exclusion. *Id.*

The Supreme Court reversed, holding the insurer could not exclude coverage on the basis of information it obtained from its insured's attorney in violation of the attorney-client relationship. *Id.* at 97-98. According to the Court, insurer-hired "counsel should not be expected to communicate information received in confidence or to betray confidences lodged in them by trusting clients," because doing so "would not only destroy public confidence in the legal profession, but also would make defense attorneys investigators for carriers." *Id.* at 97 (internal quotations omitted). Insurers have independent means of developing information to assess coverage, and the fact that an insurer has not pursued those avenues "is no compelling reason why defense counsel should be asked to betray the trust reposed in him by the insured." *Id.* (internal quotations omitted). At bottom, "[t]he attorney who represents an insured owes him undeviating and single allegiance whether the attorney is compensated by the insurer or the insured." *Id.* at 98 (internal quotations omitted).

As its analysis suggests, the doctrine articulated in *Parsons* is grounded in an attorney's ethical duties of loyalty and confidentiality. Indeed, *Parsons* cited then-existing ethical rules and opinions from both the State Bar of Arizona and the American Bar Association. *Parsons*, 550 P.2d at 97-98. These principles remain fundamental precepts of the attorney-client relationship to this day.

Under the current rules of professional conduct, for example, an attorney may not "reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the

representation," or a statutory exception applies. Ariz. R. Prof. Conduct 1.6(a); *see also Parsons*, 550 P.2d at 97 (insurer-hired attorney "may not reveal **any** information or conclusions derived" from the attorney-client relationship) (emphasis added). Nor does the attorney's financial arrangement with an insurer dilute the broad protections afforded the insured-client. The only way an attorney can even accept payment from the insurer is if "there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship," and "information relating to representation of [the] client" remains protected under Rule 1.6. Ariz. R. Prof. Conduct 1.8(f)(2)-(3). Consistent with these rules, and with *Parsons*, an attorney's "undeviating allegiance" to the insured means she "cannot act as an agent of the insurance company by supplying information detrimental to the insured." *Farmers Ins. Co. v. Vagnozzi*, 675 P.2d 703, 708 (Ariz. 1983) (emphasis added).

With moorings in these unassailable and ongoing principles of professional responsibility, the *Parsons* Doctrine is, at its core, about protecting the attorney-client relationship. It is therefore the breach of the client's trust – not the nature of the information – that controls the analysis. As *Parsons* put it, "[t]he standards of the legal profession require undeviating fidelity of the lawyer to his client. No exceptions can be tolerated." 550 P.2d at 98 (internal quotations omitted).

**B. This case falls squarely within the *Parsons* Doctrine, precluding National Fire from denying coverage under the Subcontractor Exclusion.**

National Fire is estopped from denying coverage under *Parsons* if four criteria are met: (1) there was an attorney-client relationship between Mitzel and Defense Counsel; (2) Defense Counsel obtained information from Mitzel in the course of their attorney-client information; (3) Defense Counsel disclosed the information to National Fire; and (4) National Fire used the disclosed information to Mitzel's detriment. *Parsons*, 550 P.2d at 99; *Lake Havasu*, 687 P.2d at 385 & n.5. The undisputed evidence easily satisfies each criterion.

### 1. There was an attorney-client relationship between Defense Counsel and Mitzel.

"It is clear in an insurance situation that a lawyer designated to defend the insured has a client-lawyer relationship with the insured." *Paradigm Ins. Co. v. Langerman Law Offices, P.A.*, 24 P.3d 593, 596 (Ariz. 2001) (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 132 cmt. f (2000)).

There is no dispute that Defense Counsel formed an attorney-client relationship with Mitzel. Defense Counsel was hired by National Fire specifically to represent Mitzel in the lawsuit Cosgrove filed, and repeatedly referred to Mitzel as his "client." (Exs. 2-3, 6, 9-11, 13-15, 17, 21.) National Fire's initial reservation of rights letters plainly state that it retained Defense Counsel "to defend [Mitzel] in the Suit." (Exs. 4-5.) This element of the *Parsons* test is satisfied.

### 2. Defense Counsel obtained information from Mitzel in the course of their attorney-client information.

National Fire's use of the Subcontractor Exclusion relies on two key pieces of information: (1) Mitzel did not have written agreements with his subcontractors; and (2) all of the work for Cosgrove was completed by subcontractors. (Ex. 24, at 272-74.) The undisputed evidence is that Defense Counsel obtained this information in the course of his attorney-client relationship with Mitzel.

Defense Counsel represented Mitzel for the entire time he was involved in this matter. In his very first letter to National Fire, acknowledging his representation of Mitzel, Defense Counsel promised to seek out as much information as possible about the extent to which Mitzel (and not subcontractors) did the work for Cosgrove. (Ex. 2.) Defense Counsel followed through with his promise, met with Mitzel, and learned that Mitzel could not locate any subcontractor agreements even though almost all of the work was completed by subcontractors. (Exs. 3, 6.) As time wore on, Defense Counsel concluded that Mitzel had, in fact, subcontracted **all** of the work. Defense Counsel specifically recalls obtaining this information directly from Mitzel, and he had

no reason, other than his representation of Mitzel, to obtain the information, regardless of its source.  (Exs. 9-11, 13-15, 17, 21, 31; Ex. 25, at 83-84, 99-100, 115, 126.)  As in *Parsons*, the information was therefore obtained "from the attorney-client relationship."  *Parsons*, 550 P.2d at 97.

### 3. Defense Counsel disclosed to National Fire confidential information about his representation of Mitzel.

The undisputed evidence is overwhelming that Defense Counsel disclosed to National Fire information he obtained as Mitzel's lawyer.

First, there can be no reasonable dispute that Defense Counsel actually disclosed the critical information to National Fire.  He first mentioned the missing subcontractor agreements and significant subcontracting work in his June 30, 2009 letter to National Fire, reporting on his meeting with Mitzel.  (Ex. 3.)  In each of his subsequent status reports, he repeated and clarified the information.  (Exs. 9-11, 13-15, 17, 21.)  Beginning in July 2010, for example, Defense Counsel began telling National Fire that "[a]ll construction work was completed by subcontractors," and he was "unable to locate written contracts" between Mitzel and the subcontractors.  (*Id.*)

Second, beyond the specific facts National Fire used to support the Subcontractor Exclusion, Defense Counsel testified that he made no effort to withhold **any** information he obtained from National Fire.  (Ex. 24, at 286-87; Ex. 25, at 27-32, 63-65, 82, 99-100, 114-15, 123, 126; Ex. 31.)  Instead, he sought to provide National Fire with everything it could have learned from a disclosure under Rule 26.1 of the Arizona Rules of Civil Procedure, which is incredibly broad.[4]  *See* Ariz. R. Civ. P. 26.1.

Third, National Fire has admitted that it did not do any investigation from which it could have independently obtained this information.  (Ex. 24, at 49, 75-79, 85, 91-92, 96-97, 119-20, 123, 132-33, 272-74.)  Adjuster Rohling said she **always** relies on

---

[4] Rule 26.1 disclosure statements are not, however, filed with the court and are not a matter of public record.  They thus would not be obtained by National Fire, except through Mitzel's counsel.

2011380128_1                               13

Defense Counsel for information about the claim, and believed she could base her coverage decision on information he provides. (*Id.* at 119-20, 123.)

Finally, Rohling admitted she relied exclusively on information obtained from Defense Counsel to assess coverage for Mitzel. (*Id.* at 75, 79, 85, 92, 272-74.) Indeed, she wrote in her coverage analysis that Mitzel did not have subcontractor agreements, "[p]er Defense Counsel." (Ex. 30.)

National Fire cannot reasonably dispute that it obtained information from Defense Counsel that Defense Counsel obtained in the course of representing Mitzel.

### 4. National Fire used the information disclosed by Defense Counsel to deny coverage and refuse to settle on reasonable terms.

The last *Parsons* element is essentially prejudice; *i.e.*, whether the insurer used the improperly obtained evidence to the detriment of the insured. *See Parsons*, 350 P.2d at 99 ("This conflict of interest constitutes a source of prejudice upon which the insured may invoke the doctrine of estoppel."). It matters not whether the insurer formally denies coverage, as it did in *Parsons*. The question instead is whether the insurer uses the information in any way adverse to the insurer, including pursuing an unreasonable settlement position. *Lake Havasu*, 687 P.2d at 385 n.5 ("same rationale applies when the information is utilized to reduce the amount of indemnification due the insured").

As with the others, this element is satisfied because Defense Counsel's conclusions that subcontractors did all of the work and there were no subcontractor agreements were essential to National Fire's analysis. Indeed, Rohling admitted there were no other facts relevant to her coverage analysis. (Ex. 24, at 274.) And it is because of that coverage analysis that National Fire refused multiple settlement offers – including several that Defense Counsel told National Fire it should take. (*Id.* at 230.) National Fire even went so far as to admit that the settlements Cosgrove offered would have been reasonable but for Rohling's coverage analysis – which, of course, relied entirely on information Defense Counsel obtained from Mitzel. (*Id.* at 222-23.)

Had National Fire not believed the Subcontractor Exclusion applied, it would have accepted Cosgrove's reasonable settlement offers and not exposed Mitzel to a substantial judgment. That prejudice is more than enough to satisfy the *Parsons* analysis. *Parsons*, 350 P.2d at 98 (requiring mere "detriment[]" to the insured).

## IV.     CONCLUSION

Cosgrove having presented the Court with undisputed evidence to meet every element of the *Parsons* Doctrine, National Fire is estopped from denying coverage on the basis of the Subcontractor Exclusion.

DATED this 2nd day of November, 2016.

> LEWIS ROCA ROTHGERBER CHRISTIE, LLP
>
>
> By */s/ Steven J. Hulsman*
>     Steven J. Hulsman
> *Attorneys for Plaintiff/Counterdefendant*

CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2016, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*/s/ May Livingston*