Jay R. Graif, State Bar No. 017246
Jennifer M. Bahling, State Bar No. 013260
**GRAIF BARRETT & MATURA, P.C.**
1850 North Central Avenue, Suite 500
Phoenix, Arizona 85004
Telephone: (602) 792-5700
Facsimile: (602) 792-5710
Email: jgraif@gbmlawpc.com
       jbahling@gbmlawpc.com

*Attorneys for Defendant National Fire
& Marine Insurance Company*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Karen Cosgrove, a single person,<br><br>Plaintiff/Counterdefendant,<br><br>v.<br><br>National Fire & Marine Insurance Company, a foreign insurer,<br><br>Defendant/Counterclaimant. | Case No. CV-14-02229-PHX-HRH<br><br>**DEFENDANT NATIONAL FIRE & MARINE INSURANCE COMPANY'S RESPONSE TO PLAINTIFF'S REVISED PARTIAL SUMMARY JUDGMENT MOTION RE ESTOPPED COVERAGE DEFENSES**<br><br>**Oral Argument Requested**<br><br>**Assigned to Honorable H. Russel Holland** |

Defendant National Fire & Marine Insurance Company ("National Fire"), by and through its counsel undersigned, hereby responds to Plaintiff's Revised Partial Summary Judgment Motion Re Estopped Coverage Defenses. In short, Plaintiff argues that the *Parsons* decision estops National Fire from asserting the "Subcontractor Exclusion" as a coverage defense in this case. (Notably, although the Motion refers to "coverage defenses", Plaintiff argues only that National Fire is estopped from asserting the "Subcontractor Exclusion" in this case. Plaintiff has not presented any factual or legal basis for applying *Parsons* to any other coverage defense that may be asserted by National Fire nor has it argued that National Fire is estopped from relying on any other coverage defense.) As discussed further below, the Court should deny Plaintiff's Motion.

As set forth in the separate Motion for Partial Summary Judgment filed by National Fire (Dkt. 140), the "Subcontractor Exclusion" precludes coverage for a loss if

1  the alleged damage arises out of work performed by subcontractors and the insured failed
2  to meet certain conditions precedent to coverage with regard to that work. It is
3  undisputed that all work on the Cosgrove residence (with the possible exception of the
4  framing) was done by subcontractors and that the insured failed to satisfy those
5  conditions precedent. As a result, any and all damage included in the judgment obtained
6  by Plaintiff that is related to work performed by subcontractors is not covered as a matter
7  of law.

8  Since the policy does not apply to the subcontractor's work, Plaintiff attempts to
9  assert the *Parsons* case in an attempt to avoid its application. The *Parsons* doctrine
10 cannot and should not be applied to the facts of this case because the fact that WTM
11 hired subcontractors to perform work on the Cosgrove residence and did not enter into
12 written contracts with those subcontractors was neither confidential nor privileged
13 information in this litigation. Rather, the use of subcontractors and WTM's contractual
14 relationship with the subcontractors was a matter of public record, especially given that
15 third-party claims were filed by defense counsel on behalf of and authorized by WTM.
16 Many of the subcontractors themselves became third-party defendants in this case and
17 filed pleadings of their own describing the work they performed and the absence of any
18 written contracts with WTM. This information was further shared with all of the parties
19 to this litigation in the form of depositions (including the insured's own deposition),
20 motions and written discovery (such as the insured's job file) filed or served in this case.
21 For these reasons and others, the *Parsons* doctrine does not apply and National Fire
22 should be permitted to rely on the Subcontractors Exclusion in its policy.

23  As *Parsons* does not apply here, Plaintiff's Motion must be denied.
24  This Response is supported by the following Memorandum of Points and
25 Authorities and the entire record in this action.

26  **MEMORANDUM OF POINTS AND AUTHORITIES**
27  **A.  INTRODUCTION**
28  Plaintiff is attempting to collect the entire amount of a stipulated judgment she

2

entered into with National Fire's insured, WTM Construction ("WTM"), under the National Fire policy. As discussed in National Fire's separate Motion, much (if not all) of this stipulated judgment simply is not covered under the National Fire policy. Notably, Plaintiff has not argued that there is coverage for the damages included in the stipulated judgment; rather, instead, she argues that National Fire should be precluded from raising its coverage defenses. Specifically, she argues that National Fire cannot rely on its M-5095 endorsement entitled "Independent Contractors and Subcontractors Coverage Requirement—Exclusion" ("the Subcontractor Exclusion"). This endorsement provides that there is no coverage for bodily injury or property damage related to work performed by subcontractors unless WTM entered into written subcontract agreements with specific indemnity and insurance provisions.[1] WTM's undisputed failure to do so resulted in a lack of coverage for any damage arising out of the subcontracted work. Here, Plaintiff does not challenge that WTM failed to comply with the Subcontractor's Exclusion; rather, Plaintiff's sole argument is that National Fire improperly learned from its retained defense counsel that WTM used subcontractors and failed to enter into written subcontract agreements with them. Thus, Plaintiff claims National Fire should be estopped to deny coverage based on a misconstrued application of *Parsons v. Continental Nat'l. Am. Group*, 113 Ariz. 223, 550 P.2d 94 (Ariz. 1976) ("*Parsons*").

Arizona courts have clearly found *Parsons* was not meant to apply to the type of routine defense counsel reporting that was done in a construction defect case such as this or to the facts and issues presented in the underlying case. Plaintiff's Motion itself also includes numerous alleged "facts" and testimony that are similarly misconstrued and misrepresented. Many of these facts have no bearing on the sole issue set forth in this Motion—whether *Parsons* applies here. As set forth below, a straightforward reading of the *Parsons* decision itself, along with the subsequent case law interpreting *Parsons*,

---

[1] The specific conditions of this endorsement, and the purpose behind this endorsement, is discussed in detail in National Fire's Motion for Partial Summary Judgment [Dkt. 140].

3

clearly indicates that it does not apply. National Fire is entitled to assert this endorsement to deny coverage for Plaintiff's claims.

**B.    PERTINENT FACTS**

Plaintiff has included an entire section of what she has entitled "Undisputed Facts." Many of the facts included by Plaintiff, however, are not undisputed and/or are taken out of context and misrepresented. In addition, a large portion of Plaintiff's Motion contains "facts" that are wholly irrelevant to the sole issue of the Motion—i.e., whether *Parsons* applies to this case. Set forth below are the only facts that are pertinent.

Importantly, the one fact that Plaintiff does not dispute is that there were no subcontracts and that the insured, WTM, did not comply with the requirements of the "Subcontractor Exclusion." In other words, Plaintiff does not dispute that the Subcontractor Exclusion applies. Instead, she focuses solely on how that information was learned by National Fire and whether it was wrongfully communicated by defense counsel in violation of some sort of attorney-client confidence. It was not.

As noted in Plaintiff's Motion, defense counsel learned early on in the underlying case that the work was done by subcontractors and that no subcontract agreements could be located. (*See* Plaintiff's Motion, Dkt. 145, p. 4). That fact, contrary to what is alleged in Plaintiff's Motion, was learned not only through conversations with the insured but through a thorough review of the job file and other pertinent documents. In his June 30, 2009 letter to National Fire, defense counsel stated that he had "met with your insured and reviewed the limited documentation available." (Dkt. 145-1, Ex. 3). Defense counsel expanded on this in his deposition:

> Q. Do you know whether or not Bill Mitzel actually told you that information or is it something that you may have derived yourself from the review of the job file?
>
> A. I think it may have been some of both.

(Deposition of Richard Righi, attached hereto as Exhibit 1, p. 99).

That fact that WTM retained subcontractors to perform most (if not all) of the work on the Cosgrove home and did not enter into written subcontracts or indemnity

4

agreements with them was then conveyed to National Fire as part of routine reporting by defense counsel. As defense counsel has clearly testified, it was standard to obtain this type of information in any construction defect case, and it was standard to relay this type of information to the carrier.

> A. We report what we know in all of our cases. It's a very rare instance where I get information from a client that isn't reportable.
>
> Q. Do you recall anything rare about the Cosgrove case?
>
> A. Not particularly, no.
>
> Q. As far as you recall, this was like the vast majority of the cases you defended?
>
> A. Yeah.

(*Id.* at pp. 66-67). In addition, this type of information was not considered confidential in any manner, as it was a matter of public knowledge through the standard practice of pleadings and disclosure statements in these types of cases.

> A. [I]f a client tells me something privileged, tells me something important, I'm not going to report that. But for the most part, we report all the facts, all the developments, everything that happens, because what we're reporting is in the –it's in the record. It's in a deposition or a disclosure or it's in a depository. It's out there for public consumption. So if that's the case, we report it.

(*Id.* at p. 28). The job file was produced to all parties pursuant to A.R.C. P. Rule 26.1, as routinely occurs in these types of cases. The fact that there were no written subcontract agreements was never a confidential issue nor is it ever a confidential issue in this type of a case.

> Q. The issue of whether subcontract agreements were used or not used in the course of the construction of this—of this project was information that would have or could have existed in WTM's job file, correct?
>
> A. Well, it did. I mean, the information regarding the subcontracts was very clear in the documents. It was published to everyone. And so I don't view that as a privileged communication.
>
> Q. And it was also information that would exist in the subcontractor's job file, correct?
>
> A. That's right. It's just common knowledge. It's common knowledge to the case.

5

1 (*Id.* at p. 115).

2    It was also standard to file third-party claims against the subcontractors whose work was implicated in the lawsuit. In this case, WTM authorized the filing of a Third-Party Complaint against the various subcontractors, at which time the information also became public knowledge and a matter of public record. In fact, filing such a Complaint was part of defense counsel's job in representing and protecting his client, WTM.

> A. Well -- and it's not specific to this case. In any case where we are representing a general contractor, it's important to transfer the risk to the extent we can.
> Q. So you can accumulate as much money as possible from the subcontractors to apply towards any judgment or any settlement with the plaintiff?
> A. That's right.

(*Id.* at p. 116). At that point, the knowledge regarding the non-existence of the subcontracts became public knowledge as that would have been evident in the claims included in the Complaint.

> Q. If you file a third-party complaint against a subcontractor, what causes of action can you bring against that subcontractor?
> A. Well, we can bring -- if we have a subcontract, we bring an express indemnity claim in addition to, you know, negligence, implied warranty, express warranty if we have a contract, declaratory relief if we want to get a ruling from the court on our indemnity action early. So these are -- that's a list of -- there are others, but we don't typically bring others.
> Q. And if no subcontractor agreement exists between the general contractor and the subcontractor, you're limited to only bringing a common law indemnity claim, correct?
> A. Implied indemnity and common law indemnity.

(*Id.* at pp. 116-17; *see also* Third-Party Complaint, attached hereto as Exhibit 2).

   Notably, Plaintiff has included in her Motion a number of other statements, such as the amount National Fire paid to defense counsel's firm to defend the underlying case; the alleged failure of National Fire to split claims files; and the failure of National Fire to settle the underlying claim in general. While Plaintiff may attempt to argue these issues as part of her alleged bad faith claim, they are nothing more than a red herring here and

have no place in, and certainly no relevance to, this Motion other than as an attempt to distract the Court and/or paint a negative picture of National Fire. As a result, National Fire has not responded to each and every fact submitted by Plaintiff that is not relevant to the issue of this Motion. The only relevant issue here is whether this case falls within the parameters of *Parsons*. As discussed below, it clearly does not.

**C.     THE *PARSONS* CASE**

In order to fully understand Plaintiff's argument, it is important to put the *Parsons* case in perspective. *Parsons* was initially decided in and applied to a very specific set of facts. The insured, Smithey, a minor at the time, assaulted his neighbors, the Parsons. Smithey's carrier, CNA, hired attorney Watt to defend the insured and proceeded to investigate the claim. CNA initially concluded that Smithey was not in control of his senses at the time of the assault and, therefore, determined there was coverage for the claim. 113 Ariz. at 224-25, 550 P.2d at 95-96. After suit was filed, however, Watt informed CNA that he had independently obtained a "rather complete and confidential file" on Smithey from the institution in which he was detained, which detailed his psychiatric treatment there. Watt informed CNA at that time that because of the contents of this file, he [Watt] determined Smithey knew what he was doing at the time of the assault and the assault "can only be a deliberate act on his part." *Id.* at 225, 550 P.2d at 96. Watt also personally interviewed Smithey himself and informed CNA that "his own story makes it obvious that his acts were willful and criminal." *Id.* CNA, after receiving this information, changed its coverage position, issued a reservation of rights letter and advised the insured there was no coverage for an intentional act. A directed verdict was entered against Smithey at trial after he put on no evidence in his defense (including the confidential report). *Id.*

The Parsons then proceeded to garnish the CNA policy to collect the uncontested judgment amount. Watt thereafter defended CNA in the garnishment action and utilized the confidential report and statements he had obtained from the insured to successfully argue there was no coverage due to the intentional act exclusion. *Id.* at 226, 550 P.2d at

97.     The Parsons appealed, arguing that the carrier should have been estopped to use any privileged and confidential information obtained from the confidential file of Smithey as that information was gained by "taking advantage" of the fiduciary relationship between retained counsel and his client. The Arizona Supreme Court ultimately held as follows:

> When an attorney who is an insurance company's agent uses the *confidential relationship* between an attorney and a client to gather information so as to deny the insured coverage under the policy in the garnishment proceeding we hold that such conduct constitutes a waiver of any policy defense, and is so contrary to public policy that the insurance company is estopped as a matter of law from disclaiming liability under an exclusionary clause in the policy.

*Id.* at 228, 550 P.2d at 99 (emphasis added).

The *Parsons* case involved a very narrow set of facts. In *Parsons*, the attorney quite clearly obtained *confidential and privileged* information from his client and as a result of his attorney-client relationship with his client. The information contained in Smithey's confidential file was not something that anyone else would otherwise be able to obtain. It was not information that would otherwise become public had counsel not shared it. And it was information that was clearly considered confidential and private in nature. In fact, it was never even disclosed as part of any type of discovery or disclosure in the underlying case. In addition, the same attorney who represented Smithey in the underlying suit then turned around and defended the carrier in the subsequent coverage action and used this same previously-undisclosed information in order to defeat coverage under the policy—information that never would have been available to the carrier except for Watt's attorney-client relationship with Smithey and his ability to obtain this confidential information.

Similarly, in *Lake Havasu Community Hosp., Inc. v. Arizona Title Ins. and Trust Co.,* 141 Ariz. 363, 687 P.2d 371 (Ariz. App. 1984), *disapproved on other grounds, Barmat v. John and Jane Doe Partners A-D,* 155 Ariz. 519, 747 P.2d 1218 (Ariz. 1987), the Court found a *Parsons* violation when the attorney retained by the title insurance company used his "confidential relationship" with his client and "divulged confidential

and privileged information" to the carrier which adversely affected the rights of his client. 141 Ariz. at 377, 687 P.2d at 385. Specifically, the attorney informed the carrier that: "I believe [the insured is] attempting to settle the case and set the title company [carrier] up as the prime defendant in a damage action….I will be very happy to confer with you on this if you deem it necessary." *Id.* Further, there was testimony from the carrier that it considered the defense attorney to represent the interests of both the insured as well as "the interests of Arizona Title in minimizing its liability under the title insurance policy." *Id.* On this basis, the Court found that the attorney clearly "continued to work as attorney for [the insured] while his loyalty to the client was diluted by his allegiance to [the carrier]." *Id.* Further, the Court expressly pointed out that the correspondence between the retained counsel and the insurance carrier "clearly indicates not only a divided loyalty on the part of [the attorney] but also a divulgence of confidential and privileged information of the insured…." *Id.* at 376, 687 P.2d at 384. As a result, the carrier was precluded from asserting a defense that it would not have paid its policy limits to settle the claim.

Both *Parsons* and *Lake Havasu City* are clearly distinguishable from the set of facts in this case and from this type of case in general. There is no evidence that defense counsel here conveyed any confidential or privileged information to National Fire. Rather, defense counsel reported the type of information that is normally shared with insurance companies in construction defect cases—who performed the work on the project (subcontractors) and that the insured would only be able to make implied indemnity third-party claims against them (given the lack of written contracts). None of this was or could remain confidential because it was integral to the defense of WTM to file public pleadings to bring in those subcontractors as third-party defendants. In addition, the reasoning in *Parsons* and *Lake Havasu City* simply does not apply to a case like this. That is precisely why this District Court already has refused to apply *Parsons* in a case where, as here, defense counsel reported such typical non-confidential information to an insurance carrier in a construction defect lawsuit.

In *American Family Mut. Ins. Co. v. Clancy,* 2011 WL 13077359 (D. Ariz. 2011), this Court specifically applied the *Parsons* analysis to a construction defect case. In *Clancy,* the insureds had been sued for breach of contract, misrepresentation and other related claims pertaining to their construction and sale of a residence. American Family provided a defense to its insureds under a reservation of rights. After a settlement, American Family filed a declaratory relief action to determine coverage. American Family had asserted a number of coverage defenses, including a business pursuits exclusion, an intentional act exclusion, and "insured contract" exclusion and the lack of an "occurrence" under the policy. Rather than asserting any specific coverage arguments, the insureds simply argued instead that American Family could not rely on any policy exclusions pursuant to *Parsons* because it had obtained information from its defense counsel. This Court first noted that, unlike in *Parsons,* the attorney retained by American Family to defend the insureds in the underlying lawsuit "did not use his attorney-client relationship to learn confidential facts from his client then share those facts with Plaintiff to deny coverage. To the contrary, [the attorney] advocated on their behalf and frequently took positions contrary to [American Family's] interests." *Id.* at p. 5. The Court pointed out that the attorney engaged in settlement negotiations and attempted to get American Family to contribute more toward settlement on behalf of his clients and that he attempted at all times to put his clients in the best possible position for the defense of the case or a favorable settlement. In addition, the Court noted that much of the information conveyed to American Family was "public record" and that the attorney had not revealed any "confidential information." *Id.*

The Ninth Circuit upheld this portion of the District Court's decision. 512 Fed. Appx. 674 (9th Cir. 2013). The Ninth Circuit noted that "*Parsons* is inapposite to the facts here." *Id.* at p. 675. The Ninth Circuit then expressly stated:

> [T]he information shared between [the attorney] and [American Family] was information typically shared between an insured's attorney and the insurance company. It was not confidential information. [The attorney] himself testified that there was nothing exceptional about the information exchanged between himself and [American Family]. He further testified that the only interest he had in

>coverage was his hope that American Family would pay for some of the damages assessed against his clients.

*Id.* The Court found that *Parsons* did not apply since there was no sharing of privileged information and that the attorney had not "breached his duty of loyalty." *Id.*

### D. THE APPLICATION OF *PARSONS* TO THIS CASE.

The premise of the *Parsons* decision was that the attorney retained by the insurance carrier used his position to obtain confidential and privileged information from his client (the insured) and about his client and then conveyed that information to the insurance carrier along with his specific opinions regarding the insured's own state of mind and conduct—opinions that directly related to whether there was coverage under the policy. That same attorney then *represented the insurance carrier* and used that information to deny coverage. Similarly, in *Lake Havasu,* the attorney retained by the carrier admittedly was representing the interests of both the insured and the insurer at the same time and specifically relayed information to the carrier regarding the confidential thoughts and actions of his client, the insured, in order to help the carrier protect itself against a claim by its insured.

The situation here, in this case, is not remotely similar to those situations in *Parsons* and *Lake Havasu*. More specifically, this case is missing the very element on which *Parsons* is based—the confidential nature of information conveyed to the insurance company. The information at issue here is simply the identity of who performed work on a construction project and the existence, or lack thereof, of subcontract agreements. There is nothing confidential about the existence of subcontracts, or the lack of subcontracts, in a construction defect case. The subcontract agreements are routinely produced, as part of the job file, in this type of case. There is nothing indicating that the insured intended this information to be confidential in any manner or that the insured relayed this information to its counsel in confidence. In fact, the insured himself testified in his deposition in the underlying case that all work was done through subcontractors and that the only "contracts" consisted of a proposal submitted by the subcontractor and signed by WTM.

11

(Deposition of William Mitzel, attached hereto as Exhibit 3, pp. 13, 40-41, 49). The subcontracts, or lack of subcontracts, were simply a routine fact in the underlying case, a set of documents that always are produced in the course of such a case. And clearly this information was not confidential in nature if it is the subject of deposition testimony. In fact, as is typical in construction defect cases, a Third-Party Complaint ultimately was filed against the subcontractors. That pleading, authorized by WTM, included a claim for common law/implied indemnity due to the lack of subcontracts. In short, this information was a part of the routine defense, disclosure and pleadings in the case. It was not "confidential" simply because the information, at least in part, came from a discussion with the insured. In fact, Plaintiff does not even attempt to argue that this type of information is "confidential."

*Parsons* discusses only "confidential information." A carrier is estopped only from using "confidential information." The purpose is to prevent defense counsel from "betray[ing] confidences lodged in them by trusting clients." 113 Ariz. at 227, 550 P.2d at 98. That simply does not apply here. To hold otherwise would mean that a defense counsel could never report any information about a case to the insurance carrier nor could it disclose any information about the case simply because it was obtained from his client. That is not the way a construction defect case works. Information about who performed what work on the project routinely is, and must be, disclosed during the defense of a construction defect case. Likewise, in a construction defect case the presence or absence of a subcontract agreement will always be a known fact based on the insured's job file, the subject matter of written discovery, a topic covered in the insured's deposition and a fact regularly reported to an insurance carrier in light of the need to file third-party claims against the subcontractors. If *Parsons* were to be applied as Plaintiff suggests, defense counsel would be prevented from responding to discovery, filing any pleadings on behalf of his client, or reporting on the insured's contractual indemnity rights against its subcontractors (or any other matter). That clearly is not the intent and purpose of *Parsons*.

*Parsons* itself, as pointed out by Plaintiff in her Motion, is rooted in the ethical obligations of an attorney not to betray confidences of a client. In fact, Plaintiff refers to Ariz. R. Prof. Cond. 1.6(a) which is expressly entitled "Confidentiality of Information." That rule, by definition, is meant to prohibit an attorney from disclosing *confidential* information. The mere fact that a client relays information to his or her counsel does not make it "confidential" information. That is particularly the case here where the information was also relayed to all of the other parties through disclosure and where the insured himself freely relayed this same information in a deposition.

The *Clancy* case is controlling here. This Court in *Clancy* clearly distinguished *Parsons* in this very situation, noting that there was no disclosure of "confidential information" and that the information conveyed by the defense attorney was the type of information routinely conveyed by counsel to an insurance carrier in a case like this. Such is the case here. There was no disclosure of "confidential information" but simply a routine reporting of the facts of the case. As defense counsel testified, he reported to National Fire just as he does in every case, unless it was something shared "in confidence" by the client. (Exh. 1, p. 114). The information regarding subcontracts was simply "common knowledge" to this case, not a privileged piece of information shared in confidence. (*Id.* at p. 115). Neither the facts of *Parsons* nor the reasoning behind *Parsons* pertains to this kind of case and the reporting of this type of information.

Plaintiff asserts there is a "four part criteria" test to determine whether *Parsons* applies here—1) an attorney-client relationship; 2) obtaining information from the insured in the course of the attorney-client relationship; 3) the disclosure of information by defense counsel to the carrier; and 4) use of the information by the carrier to the insured's "detriment". The *Parsons* case itself at no time discusses any such "criteria" or test. In fact, the entire premise of *Parsons* is the use of *confidential* information obtained by counsel and wrongfully disclosed to a carrier. Nowhere does Plaintiff mention this element of confidentiality in her so-called "four-part criteria" test. In fact, Plaintiff does not even attempt to make the argument that defense counsel relayed confidential and

13

1  privileged information to National Fire.  Without that element, the other four "criteria"
2  argued by Plaintiff are irrelevant because they do not accurately reflect the holding in
3  *Parsons*.

4  The evidence here is not even clear that defense counsel obtained this information
5  from the insured solely during the course of his attorney-client relationship.  Defense
6  counsel worked up this case just like he would have done in any other case.  Not only did
7  he speak with the insured at some point, but he also reviewed the job files and all other
8  information available.  In fact, according to counsel (and contrary to what Plaintiff has
9  stated), he cannot recall specifically where he obtained the information regarding the
10 subcontracts.  More importantly, the information conveyed to National Fire regarding the
11 subcontracts was not "confidential" information as portrayed by Plaintiff.  Counsel
12 testified that he conveyed the same information that he would in any other case of this
13 nature and that such information was a matter of public record.  Such information would
14 be known, for example, by the other parties in the case because it bears on third-party
15 claims.  Such information was disclosed to Plaintiff during the insured's deposition and
16 via production of the insured's job file.  Such information would be in the third-party
17 defendants'/subcontractors' own job files.

18 Plaintiff suggests that such information could not be conveyed to National Fire
19 but, yet, National Fire could have (as Plaintiff also suggests) appointed a separate adjuster,
20 done its own investigation, and could have easily come up with the same information.
21 How, then, can this information be considered confidential? If such information is readily
22 available, it is, by definition, *not* confidential.  Should retained counsel be precluded from
23 any routine defense reporting to an insurance carrier simply because a fact may have been
24 obtained from a client, even though that same fact was also disclosed to or by numerous
25 other parties in the litigation? That is clearly nonsensical and not what *Parsons* was
26 attempting to address.  The very basis of *Parsons* is not just where the specific
27 information came from but whether it was privileged information that was not meant to be
28 conveyed at all.  *Parsons* dealt with confidential information that was not available from

14

any other source but only available as a result of the confidential nature of the attorney-client relationship. It is meant to apply where such information is not routinely disclosed in any manner.

And can such information be considered confidential when it can become a matter of public record simply by the filing of a Third-Party Complaint against the subcontractors? Or should counsel be prohibited from filing such a pleading? Taking this argument to the extreme would mean that counsel would be precluded from using such information to represent the best interests of his own client.

> Q. There has [sic] been assertions made in this case that you or your office should not have revealed to National Fire whether or not subcontracts existed in this case. The only way to prevent the disclosure of the existence or nonexistence of subcontractor agreements would have been by not filing a third-party complaint, correct?
>
> A. Right. I mean, the -- by filing a third-party complaint and only having common law claims, it's obvious that there are no subcontracts. It's just part of the case. It's just common knowledge to the case.
>
> Q. So if you would have withheld that information from National Fire and from the world that no subcontract agreements existed, you would have been precluded from filing a third-party complaint, correct?
>
> A. Potentially. Or if we filed the third-party complaint, the subcontractors would -- it would come out there anyway because they would, you know, send us written interrogatories demanding the subcontracts. I mean, it's going to be discovered.
>
> Q. But the only way to truly withhold that information is to not file a third-party complaint at all?
>
> A. I see what you're asking. Yes, that makes sense.
>
> Q. And that would be very detrimental to your client, correct?
>
> A. It would.

(Exh. 1, pp. 116-17). If counsel were prohibited from filing a third-party complaint on behalf of his own client, he would potentially be giving up additional avenues of recovery for the insured. Should defense counsel be limited in doing his job and fully representing the best interests of his client in this situation? No one has suggested such an absurd result. And, as stated, such information would have been readily available as soon as such a pleading was filed. This information simply is not confidential information.

Finally, Plaintiff argues that if there is prejudice to the insured, then *Parsons* applies. The Court in *Parsons* does not actually use such language. There is always some arguable "prejudice" to the insured if a carrier denies or limits coverage. But, here, the insured was not prejudiced any more than it would have been if National Fire had obtained this readily available and commonly-known information in some other way. Most importantly, this is not a situation where defense counsel worked to the detriment of his own client and divided his loyalties, so to speak. As in *Clancy*, defense counsel attempted at all times to represent the best interests of his client, WTM. As set forth in Plaintiff's own Motion, defense counsel attempted to obtain settlement authority on behalf of his client and repeatedly recommended that National Fire authorize him to settle the case. (Dkt. 145, p. 8). When the case did not settle, defense counsel proceeded to protect his client by helping WTM enter into a Morris Agreement with Plaintiff. (*Id.* at p. 9). Although Plaintiff continues to make assertions as to National Fire's failure to settle the case, there is no doubt that defense counsel worked tirelessly on behalf of his client to try to do so. If Plaintiff wishes to ultimately allege that National Fire is at fault for the failure to settle the claim, she can certainly do so. But that is an issue for another day. It has no place here. The fact is, defense counsel did his job and, as the Court pointed out in *Clancy*, this simply is not a *Parsons* situation. To stretch *Parsons* and apply it in this context involving routine reporting by defense counsel regarding the insured's defense and information widely available and in the public record in the litigation would lead to far-reaching results certainly not contemplated by that Court.

**E.   CONCLUSION.**

Plaintiff claims National Fire has a duty to indemnify her, as the assignee of WTM. Plaintiff seeks to recover the amount of the stipulated judgment entered into between Plaintiff and WTM, as reduced by the Court in the underlying lawsuit. It is the Plaintiff's burden, however, to establish that each and every element of the stipulated judgment is covered by the National Fire policies. She has not done so. In particular, she has failed to establish that WTM met the conditions precedent of the M-5095

1  Subcontractor's Exclusion.  As a result, any damages pertaining to any work done by
2  subcontractors is not covered by the National Fire policies, and it is undisputed the work
3  was done by subcontractors.  In order to avoid such a result, Plaintiff attempts to assert a
4  *Parsons* argument and preclude National Fire from relying on the Subcontractor
5  Exclusion to deny coverage.  As set forth above, however, the *Parsons* holding, and the
6  reasoning behind *Parsons*, simply does not apply to the type of routine defense counsel
7  reporting done in a typical construction defect case, nor does it apply to the specific facts
8  of this case.  Defense counsel did not take advantage of his attorney-client relationship,
9  nor did he betray the trust of his client or disclose privileged or confidential information.
10 Rather, counsel simply reported the standard information that is conveyed to the carrier
11 in all of these types of cases—information that was required to be disclosed among the
12 parties to the litigation and was available from other sources and information that is made
13 a part of the public record in the lawsuit itself.  Such information is not, and should not
14 be, subject to a *Parsons* argument simply because it may come, at least in part, from
15 defense counsel.  To hold otherwise would lead to absurd results and, if taken to the
16 extreme, would essentially prevent counsel from fully defending his or her own client.

17 For the foregoing reasons, National Fire respectfully submits that Plaintiff's
18 Motion must be denied.

19 DATED this 15th day of December, 2016.

GRAIF BARRETT & MATURA, P.C.

By /s/ Jay R. Graif
Jay R. Graif
Jennifer M. Bahling
1850 North Central Avenue, Suite 500
Phoenix, Arizona 85004
*Attorneys for Defendant National Fire & Marine Insurance Company*

17

**CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2016, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF system for filing and transmittal of Notice of Electronic filing to the following CM/ECF registrants:

Everett S. Butler
Matthew D. Williams
THE BUTLER LAW FIRM
3800 North Central Avenue, Suite 810
Phoenix, Arizona 85012-3338

Steven J. Hulsman
Lewis Roca Rothgerber Christie LLP
201 East Washington Street, Suite 1200
Phoenix, AZ  85004-2595


/s/ Carolyn Harrington