WO

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| KAREN COSGROVE, a single person, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NATIONAL FIRE & MARINE INSURANCE | ) | |
| COMPANY, a foreign insurer, | ) | |
| | ) | No. 2:14-cv-2229-HRH |
| Defendant. | ) | |
| | ) | |

## O R D E R

### Partial Summary Judgment Motions

Plaintiff moves for partial summary judgment.[1]  This motion is opposed,[2] and defendant also moves for partial summary judgment.[3]  Defendant's motion for partial summary judgment is opposed.[4]  After hearing oral argument on plaintiff's motion, the court granted plaintiff's motion on the record.  Defense counsel agreed that in light of the court's

---

[1]Docket No. 147.

[2]Docket No. 150.

[3]Docket No. 160.

[4]Docket No. 161.

ruling, defendant's motion for partial summary judgment was moot.  What follows is a detailed order explaining the court's decision as to plaintiff's motion for partial summary judgment.

<u>Facts</u>

Plaintiff is Karen Cosgrove.  Defendant is National Fire & Marine Insurance Company.

In October 2003, plaintiff hired WTM Construction, which was owned by William and Lana Marie Mitzel, to remodel her house.  Plaintiff contended that WTM did a poor job, and on April 10, 2009, plaintiff sued WTM Construction and the Mitzels in state court.

WTM was insured by defendant under policy number 72LP156131 for the period of April 28, 2003 through April 28, 2004.  On July 10, 2009, defendant advised WTM that it would "assume the defense of WTM in the [state-court] Suit subject to a full and complete reservation" of rights.[5]  Defendant advised WTM that it had retained Richard Righi to defend WTM.[6]  Defendant also advised WTM that the policy contained a Subcontractora Exclusion (Endorsement M-5095) and thus

> [t]o the extent that the damaged alleged in [the state-court Suit]
> arose out of operations performed for you by independent
> contractors or subcontractors and such independent contractors
> or subcontractors did not agree in writing to defend, indemnify
> and hold WTM harmless, failed to carry insurance with the

---

[5]Exhibit 4 at NFM-Cosgrove 03082, Plaintiff's Revised Partial Summary Judgment Motion [etc.], Docket No. 147.

[6]<u>Id.</u>

provisions required by the Independent Contractors and Subcontractors Coverage Requirement Exclusion endorsement form(s) or otherwise failed to fulfill the requirements of the endorsement(s) in any respect, the Policy does not provide coverage for the [state-court] Suit.[7]

The Subcontractors Exclusion provided:

This insurance does not apply to "bodily injury," "property damage," or "personal or advertising injury" arising out of operations performed for you by independent contractors or sub-contractors unless:

(1)     Such independent contractors or sub-contractors agree in writing to defend, indemnify, and hold harmless you and your affiliates, subsidiaries, directors, officers, employees, agents, and their representatives from and against all claims, damages, losses, and expenses attributable to, resulting from, or arising out of the independent contractor's or sub-contractor's operations performed for you, caused in whole or in part by any act or omission of the independent contractor or sub-contractor or any one directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, regardless of whether or not it is caused in part by you; and

(2)     Such independent contractors or sub-contractors carry insurance with coverage and limits of liability equal to or greater than those carried by you, including commercial general liability, workers' compensation and employers' liability insurance; and

(3)     Such commercial general liability insurance provides coverage for the independent contractors' or subcontractors' indemnity obligations set forth in paragraph (1) above; and

---

[7]Id. at NFM-Cosgrove 03093-03904.

-3-

      (4)    Such commercial general liability insurance names you as an individual insured with coverage consistent with the coverage provided in the ISO CG 2009 endorsement.[[8]]

On June 2, 2009, Mr. Righi wrote to Anne Rohling, the adjuster handling the claim for defendant, to advise that he had "met with" Mr. Mitzel "to initiate the defense of" the state-court Suit and that he would "initiate attempts to gather as much information as possible regarding the plaintiffs' allegations and the extent to which WTM Construction actually performed work at the Cosgrove residence."[9]  Mr. Righi advised Rohling that "[a]s soon as I gather this information, I will provide you with an initial analysis for your file."[10]

On June 30, 2009, Mr. Righi provided his initial evaluation to Rohling.[11]  Mr. Righi advised that he had learned that "[a]ll construction work was done by sub-contractors except for the framing" and that "[w]e have been unable to locate any sub-contract agreements."[12]  Mr. Righi testified that he thought he learned this information both from Mr. Mitzel and from

---

[8]Exhibit 28 at NFM-Cosgrove 02827, Plaintiff's Revised Partial Summary Judgment Motion [etc.],  Docket No. 147.

[9]Letter from Richard L. Righi to Anne Rohling at NFM-Cosgrove 03800, Exhibit 2, Plaintiff's Revised Partial Summary Judgment Motion [etc.], Docket No. 147.

[10]Id.

[11]Letter from Richard L. Righi to Anne Rohling, Exhibit 3, Plaintiff's Revised Partial Summary Judgment Motion [etc.], Docket No. 147.

[12]Id. at NFM-Cosgrove 01118.

a "review of the job file."[13]  Although the job file was eventually produced to all parties in the state-court Suit pursuant to Rule 26.1, Arizona Rules of Civil Procedure, the job file had not been produced in discovery as of June 30, 2009.[14]

As it turned out, the initial information that Mr. Righi obtained about the subcontractors might not have been completely accurate.  In a July 8, 2010 update, Mr. Righi informed Rohling that "[i]t appears that WTM did not perform the framing on this Project, but rather retained a company called Extreme Framing."[15]  Mr. Righi also advised Rohling that "[w]e have been unable to locate written contracts between WTM and th[e] subcontractors who performed work on the project.  At this point, we are doubtful any such contracts exist."[16]

At his deposition, Mr. Righi was asked what led him to change his conclusion about whether WTM had done the framing on the project, and he responded:

> I'm not exactly sure.  What I think happened was Bill Mitzel must have found some documents and jogged his memory about the scope of the work and who did what.  Because at the beginning of the case, he just wasn't clear about a lot of the details.  You know, it was a 6-year old project at that time.  And so he just didn't have a real specific memory of certain ...

---

[13]Deposition of Richard Louis Righi, Esq. at 99:20-25, Exhibit 1, Defendant National Fire & Marine Insurance Company's Response to Plaintiff's Revised Partial Summary Judgment Motion [etc.], Docket No. 150.

[14]WTM and the Mitzels made their first disclosure in the state-court Suit in September 2009.  Exhibit 1, Plaintiffs' Reply [etc.], Docket No. 165.

[15]Letter from Richard L. Righi to Anne Rohling at NFM-Cosgrove 00808, Exhibit 9, Plaintiff's Revised Partial Summary Judgment Motion [etc.], Docket No. 147.

[16]Id. at NFM-Cosgrove 00809.

details.  And it took a while for us to obtain documents that would help us sort of recreate the project.  And I think that's probably what happened is we found some additional materials or he remembered additional details somehow.[17]

Throughout his representation of WTM, Mr. Righi provided Rohling with updates.[18] He testified that his firm "report[s] our cases the same way.  We provide information that is out there in the public domain...  Certainly nothing secretive, nothing privileged in the sense that it could harm the client."[19]  Mr. Righi further testified that "we report all the facts, all the developments, everything that happens, because what we're reporting is ... in the record.  It's in a deposition or disclosure or it's in a depository.  It's out there for public consumption. So if that's the case, we report it."[20]  But, Mr. Righi testified that "if a client tells me something privileged, tells me something important, I'm not going to report that."[21]  Mr. Righi did not consider the information about the subcontracts to be confidential or privileged information because it "was very clear in the documents.  It was published to everyone."[22]

_____

[17]Righi Deposition at 83:23-84:13, Exhibit 25, Plaintiff's Revised Partial Summary Judgment Motion [etc.], Docket No. 147.

[18]Exhibits 10-11, 13-15, 17, 21, Plaintiff's Revised Partial Summary Judgment Motion [etc.], Docket No. 147.

[19]Righi Deposition at 63:25-64:6, Exhibit 25, Plaintiff's Revised Partial Summary Judgment Motion [etc.], Docket No. 147.

[20]Id. at 28:13-17.

[21]Id. at 10-12.

[22]Righi Deposition at 115:9-12, Exhibit 1, Defendant National Fire & Marine
(continued...)

In April 2010, Mr. Righi filed a third-party complaint in state court on behalf of WTM against seven of the subcontractors.[23]  Mr. Righi testified that such third-party complaints are filed "[i]n any case where we are representing a general contractor" because "it's important to transfer the risk to the extent we can."[24]   In the third-party complaint, WTM asserted common law implied indemnity claims against the subcontractors.[25]  Mr. Righi testified that common law implied indemnity claims were asserted, as opposed to express indemnity claims, because there were no subcontractor agreements.[26]  Mr. Righi testified that "by filing a third-party complaint and only having common law claims, it's obvious that there are no subcontracts."[27]

---

[22](...continued)
Insurance Company's Response to Plaintiff's Revised Partial Summary Judgment Motion [etc.], Docket No. 150.

[23]WTM Construction, Inc.'s Third-Party Complaint, Exhibit 2, Defendant National Fire & Marine Insurance Company's Response to Plaintiff's Revised Partial Summary Judgment Motion [etc.], Docket No. 150.

[24]Righi Deposition at 116:7-19, Exhibit 1, Defendant National Fire & Marine Insurance Company's Response to Plaintiff's Revised Partial Summary Judgment Motion [etc.], Docket No. 150.

[25]Third Party Complaint at 7, Exhibit 2, Defendant National Fire & Marine Insurance Company's Response to Plaintiff's Revised Partial Summary Judgment Motion [etc.], Docket No. 150.

[26]Righi Deposition at 116:24-117:3, Exhibit 1, Defendant National Fire & Marine Insurance Company's Response to Plaintiff's Revised Partial Summary Judgment Motion [etc.], Docket No. 150.

[27]Id. at 117:10-12.

At some point in time, Rohling determined that defendant had an 80% chance of defeating coverage based on the Subcontractors Exclusion.[28]  She testified that two of the facts she relied on in reaching this determination were that subcontractors had done all or most of the work on plaintiff's home and that WTM had no contracts with any of the subcontractors.[29]  In fact, Rohling noted that "Coverage Counsel advises that under Arizona law, [the Subcontractors Exclusion] may exclude coverage on this claim.  Per defense Counsel, WTM did no[t] produce contracts with subcontractors.  Therefore, I estimated that the court would allow the exclusion and decide that there is no coverage under the policy 80% of the time."[30]

Rohling's determination that there was an 80% chance of defeating coverage impacted settlement negotiations in the state-court Suit.  For example, at one point Mr. Righi recommended settling the state-court Suit for $110,000 and Rohling recommended $23,000.[31]  Rohling testified that the difference between Mr. Righi's recommendation and hers was

---

[28]Videotaped Deposition of Anne Rohling at 230:12-17, Exhibit 24, Plaintiff's Revised Partial Summary Judgment Motion [etc.], Docket No. 147.

[29]Id. at 272:12-274:12.

[30]Exhibit 30 at NFM-Cosgrove 03350, Plaintiff's Revised Motion for Partial Summary Judgment [etc.], Docket No. 147.

[31]Rohling Deposition at 230:8-11, Exhibit 24, Plaintiff's Revised Motion for Partial Summary Judgment [etc.], Docket No. 147.

"[t]he analysis on the coverage."[32]  As another example, in February 2011, plaintiff made a $109,000 Offer of Judgment to settle her claims against WTM.[33]  Mr. Righi requested "authority of up to $109,000 with which to negotiate a settlement."[34]  But, defendant rejected the $109,000 offer.[35]

In April 2013, on the eve of trial, plaintiff, WTM, and the Mitzels settled the state-court Suit, and on September 17, 2013, "they executed a <u>Morris</u> agreement[,]"[36] stipulating to a judgment of $443,690.[37]  The state court held a reasonableness hearing, in which defendant participated.  The state court concluded that "a reasonable total settlement would be $304,373[.]"[38]  From the $304,373 total settlement, $50,000 was deducted for the $25,000 WTM and the Mitzels had agreed to pay to settle a fraud and misrepresentation claim and the $25,000 that WTM and the Mitzels agreed to pay "if Cosgrove collected less than $443,690

---

[32]<u>Id.</u> at 230:10-12.

[33]Offer of Judgment, Exhibit 12 at NFM_Cosgrove 00776, Plaintiff's Revised Motion for Partial Summary Judgment [etc.], Docket No. 147.

[34]Letter from Richard L. Righi & Gregory E. Williams to Anne Rohling at NFM-Cosgrove 00774, Exhibit 13, Plaintiff's Revised Motion for Partial Summary Judgment [etc.], Docket No. 147.

[35]Rohling Deposition at 281:3-11, Exhibit 24, Plaintiff's Revised Motion for Partial Summary Judgment [etc.], Docket No. 147.

[36]Complaint at 2, ¶ 12, Exhibit A, Notice of Removal, Docket No. 1.

[37]Superior Court Judgment at 3, Exhibit 22, Plaintiff's Revised Motion for Partial Summary Judgment [etc.], Docket No. 147.

[38]<u>Id.</u> at 5.

from WTM's insurance carrier."[39]  Thus, the court found that "the net reasonable settlement is $254,373."[40]  "Under the <u>Morris</u> Agreement, WTM assigned to Cosgrove all of its rights, title, interests, proceeds, causes of action, and claims of any kind whatsoever related to the project that WTM may have had against its insurers, including [defendant]."[41]

On July 25, 2014, plaintiff commenced this action in state court.  The case was subsequently removed to this court.  In her amended complaint, plaintiff asserts a breach of contract claim and a bad faith claim against defendant.  Plaintiff alleges that defendant has breached the WTM insurance policy "by failing to meet its indemnity obligations under the insurance policy and by failing to make payment for the $254,373 judgment."[42]  Plaintiff also alleges that defendant has breached the WTM insurance policy

> by waiting an unreasonable amount of time to make a determi-
> nation as to indemnification and/or giving untimely notice to
> WTM that it would not indemnify it for any damages awarded
> Cosgrove or judgment entered against WTM, thereby prejudic-
> ing and damaging WTM by precluding it from (a) settling the
> matter for a lesser amount, (b) avoiding a larger judgment, and
> (c) avoiding the $25,000 payment to Cosgrove.[[43]]

---

[39]<u>Id.</u> at 2-3, 5.

[40]<u>Id.</u> at 5.

[41]Complaint at 3, ¶ 13, Exhibit A, Notice of Removal, Docket No. 1.

[42]<u>Id.</u> at 4, ¶ 26.

[43]<u>Id.</u> at ¶ 27.

Plaintiff alleges that defendant breached its duty of good faith by "seek[ing] to reduce the amount of judgment from $443,690 to $254,373, thereby ensuring that WTM would be liable to Cosgrove for the $25,000 payment."[44]  Plaintiff further alleges that defendant breached its duty of good faith when it rejected her $109,000 settlement offer, which was less than the policy limits.[45]  Plaintiff alleges that defendant "gave more consideration to its interests than WTM's and thereby placed its interests before WTM's when it rejected the offer – an offer that was predicated on WTM's and National Fire's own assessment of the damages Cosgrove had incurred as a result of WTM's conduct on the project."[46]

In its answer to plaintiff's amended complaint, defendant asserted a number of affirmative defenses, including that it "did not breach the contract; at all relevant times, National Fire acted in good faith; [and] the policy from which [p]laintiff seeks recovery does not cover the losses alleged in the Amended Complaint[.]"[47]  Defendant has also asserted a counterclaim for declaratory relief.  Defendant seeks a declaration that it "has no obligation to indemnify any party for any judgment or settlement reached" in the state-court Suit and

[44]Id. at 5, ¶ 30.

[45]Id. at 5-6, ¶¶ 34-40.

[46]Id. at 6, ¶ 38.

[47]National Fire & Marine Insurance Company's Answer to Amended Complaint and Counterclaim at 5, ¶ 54, Docket No. 5.

that its "policies provide no coverage for the claims asserted in" the state-court Suit "and/or the stipulated judgment entered" therein.[48]

Plaintiff moved for summary judgment that defendant is estopped from asserting its coverage defenses, although her briefing is limited to the coverage defense based on the Subcontractors Exclusion.   And, defendant moved for partial summary judgment on plaintiff's breach of contract claim and its counterclaim for declaratory relief.

<u>Discussion</u>

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The initial burden is on the moving party to show that there is an absence of genuine issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor.  <u>Id.</u> at 255.  "[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on

---

[48]<u>Id.</u> at 13, ¶¶ 1-2.

that evidence." <u>T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 631 (9th Cir. 1987).

Plaintiffs' motion for partial summary judgment is based on <u>Parsons v. Continental National American Group</u>, 550 P.2d 94 (Ariz. 1976).  There, in March 1967, the Parsons were assaulted by Michael  Smithey.  <u>Id.</u> at 95.  Michael, who was a minor at the time of the assault, and his parents were insured by the defendant CNA.  <u>Id.</u>  In October 1967, the Parsons filed suit against Michael and his parents alleging assault and negligence claims.  <u>Id.</u> at 96.  CNA retained counsel to represent the Smitheys.  <u>Id.</u>  CNA's retained counsel obtained a confidential school file on Michael, after which he advised CNA that he believed that Michael's assault on the Parsons had been a deliberate act.  <u>Id.</u>  After CNA received this report, it sent a reservation of rights letter to Michael's parents, stating "that it was possible the act involved might be found to be an intentional act, and that the policy specifically excludes liability for bodily injury caused by an intentional act."  <u>Id.</u>  Later, in preparing for trial, CNA's retained counsel interviewed Michael, after which he wrote to CNA that "'[h]is own story makes it obvious that his acts were willful and criminal.'"  <u>Id.</u>  "CNA also requested an evaluation of the tort case and the same attorney advised CNA:  'Assuming liability and coverage, the injury is worth the full amount of the policy or $25,000.00.'"  <u>Id.</u> The trial court ultimately granted the Parsons' motion for a directed verdict as to their assault claim against Michael and judgment was entered against him in the amount of $50,000.  <u>Id.</u> at 96-97.  "The Parsons then garnished CNA[.]"  <u>Id.</u> at 97.  "CNA successfully defended the

garnishment action by claiming that the intentional act exclusion applied." Id. "The same law firm and attorney that had previously represented Michael represented [CNA] in the garnishment action." Id.

On appeal, the Parsons argued that "CNA should be estopped to deny coverage" and found to have "waived the intentional act exclusion because the company took advantage of its fiduciary relationship between its agent [CNA's retained counsel] and Michael Smithey." Id. The Arizona Supreme Court agreed with the Parsons. Id. The court held that

> [w]hen an attorney who is an insurance company's agent uses the confidential relationship between attorney and a client to gather information so as to deny the insured coverage under the policy ... such conduct constitutes a waiver of any policy defense, and is so contrary to public policy that the insurance company is estopped as a matter of law from disclaiming liability under an exclusionary clause in the policy.

Id. at 99. The court also held that a "reservation of rights agreement is not material [when] the same attorney was representing conflicting clients." Id. The court found that an insurance carrier does not have "the right to engage an attorney to act on behalf of the insured to defend a claim against the insured while at the same time build a defense against the insured on behalf of the insurer." Id.

Plaintiff argues that there has been a Parsons violation here because Mr. Righi disclosed information that he obtained from Mr. Mitzel (WTM's agent) during the course of the attorney-client relationship and defendant is relying on that information to deny coverage. Defendant argues, however, that Parsons has no application here because it only applies if

-14-

the attorney representing the insured discloses confidential or privileged information, which the subcontractor information was not.

Defendant relies on <u>Lake Havasu Community Hospital Inc. v. Arizona Title Insurance and Trust Company</u>, 687 P.2d 371, 384 (Ariz. Ct. App. 1984), <u>disproved on other grounds by</u>, <u>Barmat v. John and Jane Doe Partners A-D</u>, 747 P.2d 1218, 1219 (Ariz. 1987), in which the court found a <u>Parsons</u> violation when the lawyer retained to represent the insured in a title dispute divulged "confidential and privileged information" that it learned from the insured to the title insurance company.  Specifically, the lawyer told the title insurance company that he "believe[ed the Hospital was] attempting to settle the case and set the title company up as the prime defendant in a damage action...."  <u>Id.</u>

Defendant also argues that this case is similar to <u>American Family Mutual Insurance Company v. Clancy</u>, Case No. CV-09-01077-PHX-ROS, 2011 WL 13077359 (D. Ariz. March 9, 2011).  There, Clancy and Palmieri built a home that they later sold to the Shapiros. <u>Id.</u> at *1.  Two years later, the Shapiros filed suit against Clancy and Palmieri in state court, asserting breach of contract, breach of warranty, and tort claims.  <u>Id.</u>  Clancy and Palmieri tendered the defense of the Shapiro lawsuit to their insurer, American Family.  <u>Id.</u> at *1-2. American Family defended Clancy and Palmieri under a reservation of rights.  <u>Id.</u> at *2. Beeghley was retained by American Family to represent Clancy and Palmieri in the Shapiro lawsuit.  <u>Id.</u> at *5.  The Shapiro lawsuit went to trial and the trial judge found Clancy and Palmieri liable for $1.09 million in damages.  <u>Id.</u> at *2. The parties then settled, and

-15-

American Family brought a declaratory judgment action in federal court, seeking a declaration that there was no coverage. <u>Id.</u> Clancy and Palmieri argued that, based on <u>Parsons</u>, American Family was precluded from asserting any policy exclusions because Beeghley had communicated with American Family during the course of his representation of Clancy and Palmieri. <u>Id.</u> at *5. The court rejected that argument because Beeghley's communications with American Family did "not reveal confidential information he obtained from his clients through the attorney-client relationship that [American Family] could use to deny coverage." <u>Id.</u> The court observed that "[m]uch of the information was public record contained in briefs or court orders" and that Beeghley's communications with American Family "were not to his client's detriment and did not reveal confidential information used to deny coverage." <u>Id.</u> On appeal, the Ninth Circuit confirmed the district court's holding that <u>Parsons</u> did not apply because "the information shared" by Beeghley "was information typically shared between an insured's attorney and the insurance company. It was not confidential information." <u>Amer. Family Mut. Ins. Co. v. Clancy</u>, Case No. 11–16270, 2013 WL 934161, at *1 (9th Cir. March 12, 2013).

Similarly here, defendant argues that the information that Mr. Righi learned about the subcontractors was not confidential information. Rather, defendant contends that all Mr. Righi learned was the identity of who had performed the work on the project and that WTM had no written agreements with its subcontractors. Defendant argues that there is no evidence that suggests that WTM intended to keep this information confidential or that Mr.

Mitzel relayed this information to Mr. Righi in confidence.  In short, defendant argues that the information about the subcontractors was simply routine information and that this information in a construction defect case is almost always a known fact based on the insured's job file.  Defendant reminds the court that Mr. Righi testified that he thought he learned this information both from Mr. Mitzel and from a "review of the job file."[49]  Thus, defendant argues that it is not even clear that Mr. Righi learned the information about the subcontractors from Mr. Mitzel.  Defendant suggests that it could have learned this information if it had, as plaintiff suggests it should have done, completed its own investigation rather than relying on the information it received from Mr. Righi.  If it could have learned this information on its own, then defendant argues that this information cannot possibly be considered confidential information.

Defendant is reading Parsons too narrowly.  Parsons held that

> [w]hen an attorney who is an insurance company's agent uses the confidential relationship between attorney and a client to gather information so as to deny the insured coverage under the policy ... such conduct constitutes a waiver of any policy defense, and is so contrary to public policy that the insurance company is estopped as a matter of law from disclaiming liability under an exclusionary clause in the policy.

Parsons, 550 P.2d at 99.  Here, Mr. Righi used the attorney-client relationship with WTM to gather information that he gave to defendant, which defendant then used to the detriment of

---

[49]Righi Deposition at 99:20-25, Exhibit 1, Defendant National Fire & Marine Insurance Company's Response to Plaintiff's Revised Partial Summary Judgment Motion re Estopped Coverage Defenses, Docket No. 150.

WTM and now wants to use to deny coverage.  At the point Mr. Righi disclosed the subcontractor information to defendant, he knew, or had reason to know, that WTM's policy contained the Subcontractors Exclusion and that defendant may attempt to deny coverage based on this exclusion.  Yet despite this knowledge, Mr. Righi communicated to defendant the very information that defendant would need to deny coverage based on the Subcontractors Exclusion.  In fact in his June 2, 2009 communication with Rohling, Mr. Righi expressly told Rohling that he would attempt to gather information about whether WTM had used subcontractors on the project.[50]  Mr. Righi owed his full loyalty to WTM, but it is clear that this loyalty was "was diluted by his allegiance" to defendant.  Lake Havasu, 687 P.2d at 384.  "Such conduct clearly violates the dictates of Parsons."  Id.

Contrary to defendant's contention, there is no requirement that the information in question be independently confidential.  Parsons only requires that the information have been obtained via the attorney-client relationship and that the disclosure of the information be to the detriment of the insured.  Defendant's reliance on Clancy is misplaced because there, during Beeghley's communications with the title insurance company, he did "not reveal confidential information he obtained from his clients through the attorney-client relationship that [American Family] could use to deny coverage."  Clancy, 2011 WL 13077359, at *5 (emphasis added).  Rather, he "shared his predictions about how the trial court would rule,

---

[50]Letter from Richard L. Righi to Anne Rohling at NFM-Cosgrove 03800, Exhibit 2, Plaintiff's Revised Partial Summary Judgment Motion [etc.], Docket No. 147.

-18-

and speculated about the reason for the trial court's ruling.... These communications did not reveal any confidential information that he learned from his clients as a result of the attorney-client relationship that [American Family] could use, let alone did, to deny coverage." Id. at *5, n.6.  Here, in contrast, defendant used the subcontractor information that Mr. Righi learned as a result of the attorney-client relationship to the detriment of WTM.

The court is mindful that the subcontractor information was used as a basis for WTM's third-party complaint, which at that point, made the information a matter of public record and available to anyone.  But by the time WTM's third-party complaint was filed,  the Parsons violation had already occurred.  Mr. Righi first disclosed the information about the subcontractors to Rohling in 2009, long before the third-party complaint was filed in April 2010.  Defendant's contention that finding a Parsons violation here would mean that Mr. Righi would have been precluded from filing a third-party complaint is not correct.  A lawyer must obtain his client's consent to disclose information in pleadings.  Disclosing client information by filing a third-party complaint, to which the client has consented, would not run afoul of Parsons.

Precluding defendant from asserting a coverage defense based on the Subcontractors Exclusion may seem like a harsh result.  But, if defendant had done its own investigation of WTM's claims, rather than relying on the information disclosed by the attorney retained to represent WTM, defendant would not be precluded from using this information to deny coverage.  Because defendant learned the subcontractor information from Mr. Righi and then

-19-

used that information to the detriment of WTM before the information was ever made public, defendant is estopped from relying on this information to deny coverage.

<u>Conclusion</u>

Based on the foregoing, plaintiff's motion for partial summary judgment[51] was granted as to the Subcontractors Exclusion.  But, to the extent that plaintiff has moved to estop defendant from asserting any other coverage defenses, her motion is denied.  The information that was improperly disclosed to defendant only pertained to the Subcontractors Exclusion. Defendant is only estopped from asserting a coverage defense based on the Subcontractors Exclusion.

Because plaintiff's motion for partial summary judgment was granted, defendant's motion for partial summary judgment[52] was deemed moot.

DATED at Anchorage, Alaska, this 10th day of April, 2017.

/s/ H. Russel Holland
United States District Judge

---

[51]Docket No. 147.

[52]Docket No. 160.